IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00942-MEH

SENSORIA, LLC, directly on its own behalf and derivatively on behalf of
CLOVER TOP HOLDINGS, INC., a Delaware corporation; and
GORDON MORTON,

      Plaintiffs,

v.

JOHN D. KAWESKE;
CHRISTOPHER S. PETERSON;
CLOVER TOP HOLDINGS, INC., a Delaware corporation;
CLOVER TOP HOLDINGS, a Colorado corporation;
AJC INDUSTRIES, LLC;
DURANGO MANAGEMENT, LLC;
SUNLIFE AG, LLC;
MMJ 95, LLC;
TWEEDLEAF LLC, a Colorado limited liability company;
TWEEDLEAF, LLC, a Delaware limited liability company;
LIFESTREAM HOLDINGS, LLC;
ORDWAY FARMS, LLC;
NORTH STAR HOLDINGS a/k/a NORTH STAR HOLDINGS, INC.;
MANUEL WELBY EVANGELISTA a/k/a WELBY EVANGELISTA;
DJDW, LLC;
JW COLORADO, LLC;
JW ORDWAY, LLC;
JW TRINIDAD, LLC;
BRIAN TANNENBAUM;
TANNENBAUM & TROST, LLC, f/k/a TANNENBAUM,
TROST & BURK, LLC; and
DOES 1-100,

      Defendants.

---

# ORDER

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court are Defendants' Motions to Dismiss (ECF 165, 168, 170). The Motions are fully briefed, and the Court finds that oral argument will not materially assist in their adjudication. For the reasons that follow, the Motions are granted in part and denied in part.

<u>**BACKGROUND**</u>

### I. Alleged Facts

For purposes of this ruling, the Court accepts as true the factual allegations—but not any legal conclusions, bare assertions, or conclusory allegations—that Plaintiffs raise in their Second Amended Complaint ("SAC"). ECF 155. *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (accepting as true a plaintiff's factual allegations for purposes of Fed. R. Civ. P. 12(b)(6) analysis).

### A. The Creation of the Clover Top Holdings, Inc. Investment Vehicle

Defendant John D. Kaweske ("Kaweske") is a citizen of Colorado. ECF 155 at ¶ 4. He was subject of four administrative proceedings and three lawsuits regarding inappropriate dealings with client funds or securities transactions. *Id*. at ¶ 44. Defendant Christopher S. Peterson ("Peterson") is a citizen of either Colorado or Arizona. *Id*. at ¶ 5.

At issue in this lawsuit is Clover Top Holdings, Inc. which Kaweske, Peterson, and Peterson's wife incorporated in September 2015. *Id*. at ¶¶ 6, 27. They were its majority owners and served as its officers. *Id*. at ¶¶ 27–29. Clover Top Holdings, Inc. is a Delaware corporation. *Id*. at ¶ 27. Its principal place of business was in Colorado (*id*. at ¶ 6), although it was not registered to do business in Colorado until September 22, 2017 (*id*. at ¶¶ 45(a), 76). It no longer is an active corporation. *Id*. at ¶ 92.

Kaweske, Peterson, and Peterson's wife formed Clover Top Holdings, Inc. "to engage in all aspects of the cannabis business, beginning in Colorado and expanding elsewhere as the business grew." *Id*. at ¶ 27. In October 2015, Clover Top Holdings, Inc. acquired TweedLeaf Delaware, which possessed the federal trademark and service mark registrations for the "TWEEDLEAF" word and drawing. *Id*. at ¶¶ 30–31.

On October 30, 2015, Clover Top Holdings, Inc. retained Brian Tannebaum, Esq. of

Tannenbaum, Trost & Burk, LLC (the law firm's name at the time) to provide legal services "regarding the purchase and/or sale of certain marijuana licenses" as well as "any other services [that it] may request from time to time." *Id*. at ¶ 33. Clover Top Holdings, Inc. retained the Tannenbaum Defendants "for both cannabis and corporate law." *Id*. Kaweske oversaw all cultivation operations for Clover Top Holdings, Inc. as well as company finances, taxes, licenses, and legal matters in tandem with the Tannenbaum Defendants. Peterson managed dispensary operations, patient care, and online/offline marketing for the TweedLeaf business. *Id*. at ¶ 54.

In January 2016, Clover Top Holdings, Inc. bought "two real estate holdings in Colorado Springs, one a retail building and the other a warehouse." *Id*. at ¶ 35. On January 26, 2016, Durango Management, LLC ("Durango") was created to hold properties and leases for Clover Top Holdings, Inc. as its real estate management company. *Id*. at ¶ 36. On February 1, 2016, "Durango purchased the two real estate holdings that were subject of Clover Top [Holdings, Inc.'s] January 2016 contract." *Id*. at ¶ 37. On March 11, 2016, Durango leased one of the properties to AJC Industries, LLC d/b/a Front Range Alternative Medicines and d/b/a FRAM ("AJC"). Kaweske is AJC's sole member. *Id*. at ¶ 8. An appraiser did not regard it as an arms-length transaction. *Id*. at ¶ 39.

In March 2016, Clover Top Holdings, Inc. purchased two existing marijuana licenses from AJC. *Id*. at ¶ 38. The Tannenbaum Defendants assisted with the transaction. *Id*. At the time, Kaweske was the only Clover Top Holdings, Inc. principal who had Colorado residence required for a marijuana license. *Id*. at ¶ 52.

## B.    The Initial Investment

Between January and March of 2016, Kaweske and Peterson solicited Gordon Morton ("Morton") to invest in Clover Top Holdings, Inc. *Id*. at ¶ 41. They portrayed it as "the holding

company or the 'mother ship' for all cannabis-related entities, technologies, and brands in Colorado and expanding beyond Colorado as its success grew." *Id.* at ¶ 42. The greater enterprise would include "dispensaries, grow operations, extraction technologies, intellectual property, other future ancillary entities, and all similar services and businesses." *Id.* Clover Top Holdings, Inc.'s shareholders would receive the profits as well as "prompt repayment of initial investments and distributions." *Id.* at ¶¶ 42, 45.

Written materials explained that Clover Top Holdings, Inc. was "established to make investments and operate businesses in the burgeoning legal cannabis industry" and for creating "a national brand for medicinal dispensaries, online store and cannabis and hemp-based products." *Id.* at ¶ 43. Clover Top Holdings, Inc. was described as a Delaware corporation based in Colorado Springs. It owns "an existing medical marijuana commercial location as well as a cannabis cultivation facility and is integrating a second fully operational and licensed medicinal cannabis business into the newly purchased locations." *Id.* Its existing business "generates between $60,000–$80,000 per month in gross revenues." *Id.* It has an "11,000 square foot cultivation facility, which is capable of growing over 4,000 plants and producing in excess of $400,000 a month of wholesale cannabis." *Id.* It owns a "medical marijuana dispensary located in a prime retail location" and will open "a new medical dispensary chain called TweedLeaf™." *Id.* Lastly, Clover Top Holdings, Inc.'s assets include intellectual property as well as proprietary hemp- and CBD-based products "that are currently legal to sell nationwide." *Id.*

On April 4, 2016, Morton paid $100,000 for 100,000 shares. Kaweske told him that he was the first outside investor. The investment was made pursuant to a Subscription Agreement for Preferred Shares. *Id.* at ¶ 46.

### C. Purported Expansion of Clover Top Holdings, Inc.

Peterson's father-in-law also owned part of the Durango entity. On June 27, 2016, he exchanged his Durango shares for Clover Top Holdings, Inc. shares. The Tannenbaum Defendants facilitated the exchange (*id*. at ¶ 46) which presumably increased Clover Top Holdings, Inc.'s ownership of Durango. In a filing with the Colorado Secretary of State on July 6, 2016, Durango identified Clover Top Holdings, Inc. as its sole owner. *Id*. at ¶ 53.

On August 8, 2016, Clover Top Holdings, Inc. issued its first investor update. It reported increasing sales over the prior three months and plans to open a second TweedLeaf medical dispensary. *Id*. at ¶ 55.

In October 2016, Clover Top Holdings, Inc. bought additional marijuana licenses from MMJ 95, LLC ("MMJ"). *Id*. at ¶ 58. MMJ was formed in October 2015 as a cannabis-related business (*id*. at ¶ 32), and Kaweske was its sole member (*id*. at ¶¶ 11, 65). Contemporaneously, Kaweske stated that an MMJ license was being transferred to Tweedleaf, LLC (*id*. at ¶ 55), an entity that Kaweske owned separate and apart from the Clover Top Holdings, Inc. enterprise and the TweedLeaf Delaware entity (*id*. at ¶ 34).

Morton visited Colorado Springs and met with Kaweske in early November 2016. Kaweske told him that the business was making money and promised to pay him first. *Id*. at ¶ 60.

Morton formed Sensoria, LLC ("Sensoria") on November 17, 2016. Sensoria paid $125,000 for an additional 125,000 shares. *Id*. at ¶ 63. Clover Top Holdings, Inc. issued a stock certificate dated November 25, 2016 and signed by Peterson and Kaweske. *Id*. at ¶ 64. All of Morton's investments in Clover Top Holdings, Inc. ultimately were made and accounted through Sensoria. *Id*. at ¶ 63.

On November 16, 2016, Kaweske incorporated Sunlife AG, LLC ("Sunlife") as a cannabis

growing and cultivation business. Peterson stated in 2019 that Sunlife was intended to be Clover Top Holdings, Inc.'s "wholly owned real estate and property management company [for] holding properties and leases in Ordway, Colorado." *Id*. at ¶ 62. However, Kaweske was Sunlife's sole member. *Id*.

Clover Top Holdings, Inc. issued another investor update on January 20, 2017. Monthly sales from the TweedLeaf business were reported, and the construction of a second dispensary was announced. Cultivation, warehouse, and production spaces were said to be expanding. *Id*. at ¶ 66.

In February 2017, Welby Evangelista ("Evangelista") and his entity, DJDW, LLC ("DJDW"), invested in Clover Top Holdings, Inc. *Id*. at ¶ 67. He served as the TweedLeaf brand's business director, worked onsite in Colorado, provided Sensoria access to the TweedLeaf locations, and raised additional investment money. He also took over the investor updates (which now were being done informally over the telephone rather than in writing), touting success in terms of money made and TweedLeaf website traffic volume. *Id*. at ¶ 68.

On June 19, 2017, a corporate entity by name of "XLeaf" was formed. It was intended either to be owned by Clover Top Holdings, Inc. or to serve as a merchant account for AJC. XLeaf later became "XLEAF Labs" that made and sold cannabis concentrate. *Id*. at ¶ 82.

In August 2017, Kaweske began developing marijuana business operations in Ordway, Colorado. Through the AJC entity, Kaweske and Peterson leased a greenhouse there. *Id*. at ¶ 71. AJC obtained marijuana licenses, and 108 acres of land were bought. *Id*. at ¶ 72. Additional greenhouses and a warehouse building were acquired. Funding for the Ordway expansion came from Clover Top Holdings, Inc., and these acquisitions purportedly belonged to it (through its ownership of Sunlife). *Id*. at ¶ 71–73. However, Kaweske now claims that the Ordway-related assets and entities belong to him. *Id*. at ¶ 73.

Clover Top Holdings, Inc. was registered to do business in Colorado for the first time on September 22, 2017. *Id.* at ¶ 76.

On October 12, 2017, Ordway Farms LLC ("Ordway Farms") was created. Its initial member was identified as "CLOVERTOP HOLDINGS, INC." *Id.* at ¶ 77.

On December 2, 2017, Clover Top Holdings, Inc. opened its second TweedLeaf dispensary for business. *Id.* at ¶ 79.

On December 10, 2017, "Kaweske shut Peterson and his wife out of Clover Top Holdings, Inc. and purported to terminate their employment with [it]." Kaweske blamed Clover Top Holdings, Inc.'s "current financial distress" on their "exorbitant spending." Sensoria was unaware of that development. *Id.* at ¶ 80. Several lawsuits were filed in Colorado state court regarding disputes between Peterson and Kaweske. *Id.* at ¶ 115.

Peterson later stated that the "intended assets and subsidiaries" of Clover Top Holdings, Inc. before December 2017 "included at least TweedLeaf Delaware, Durango, AJC, MMJ, Sunlife, Ordway Farms, and the XLeaf and XLeaf Labs Names, and their holdings and assets." *Id.* at ¶ 119.

On February 28, 2018, Kaweske bought a home in Colorado Springs for $525,000.00. *Id.* at ¶ 83.

On September 10, 2018, TweedLeaf Delaware abandoned the "TWEEDLEAF" service mark. *Id.* at ¶ 87.

Morton and Sensoria deny knowing what was happening with Clover Top Holdings, Inc. The first indication of problems occurred on November 3, 2018 when "without leadup or warning, Evangelista called and texted Morton multiple times via cell phone and made physical and financial threats against him, orally and by text, including threatening to kill Morton and his family." Evangelista accused Mortion of "stealing his money, asserting Morton's involvement in

a 'scam' against [him]." Evangelista told Morton that Sensoria and all shareholders in Clover Top

Holdings, Inc. were "f***ed." He demanded payment of millions of dollars from Morton and

threatened legal action. *Id.* at ¶ 88.

### D. Kaweske's Competing Marijuana Enterprise

Simultaneous with the creation of the Clover Top Holdings, Inc., Kaweske began a separate

marijuana operation that in effect competed with it. Plaintiffs allege that assets that originally

belonged (or were intended to belong) to Clover Top Holdings, Inc. became part of this other

enterprise.

In November 2015, Peterson incorporated another entity by name of "Clover Top

Holdings" but in Colorado rather than in Delaware ("Clover Top Colorado"). *Id.* at ¶¶ 7, 45(d),

98. Unlike Clover Top Holdings, Inc. (in which Sensoria invested), the Clover Top Colorado entity

remains an active corporation. *Id.* at ¶ 98.

In June 2016, Kaweske bought AJC (*id.* at ¶¶ 52, 56), thereby divesting Clover Top

Holdings, Inc. of that asset and its marijuana licenses. In November 2016, Kaweske registered the

TweedLeaf name and logo trademarks with AJC. *Id.* at ¶ 61. On September 12, 2017, Kaweske

assumed unlimited authority to transfer real property held in Durango's name. *Id.* at ¶ 74.

On January 18, 2018, Kaweske and Evangelista incorporated JW Colorado, LLC ("JW

Colorado") and JW Ordway, LLC ("JW Ordway") as cannabis businesses. The Tannenbaum

Defendants assisted with JW Ordway's filings. *Id.* at ¶ 81. On July 12, 2018, Kaweske and

Evangelista formed JW Trinidad, LLC ("JW Trinidad"). *Id.* at ¶ 84. On August 3, 2018,

Evangelista incorporated North Star Holdings ("North Star") as a cannabis business, for which

Kaweske served as an officer. *Id.* at ¶¶ 16, 85. The Tannenbaum Defendants were listed as North

Star's registered agent. *Id.* at ¶ 85. North Star uses TweedLeaf as one of its brands. *Id.* at ¶ 114.

On September 5, 2018, Kaweske replaced Clover Top Holdings, Inc. as Ordway Farms' sole member. *Id.* at ¶ 86. Without Sensoria's knowledge, Kaweske and Evangelista sold securities in Ordway Farms against Clover Top Holdings, Inc.'s interests. *Id.* at ¶¶ 70, 86.

On January 10, 2019, Kaweske and Evangelista registered the sale of North Star securities. TweedLeaf, TweedLeaf Dispensaries, XLeaf Labs, and Ordway Farms were listed as products and services related to the North Star securities. *Id.* at ¶ 90.

Clover Top Holdings, Inc.'s registration with Colorado became delinquent on February 1, 2019 when it did not file a Periodic Report. Its corporate status with Delaware became void on March 1, 2019 when it did not pay the annual franchise tax. It owes Delaware $108,566.68. *Id.* at ¶¶ 91–93.

On August 19, 2019, Kaweske created Lifestream Holdings, LLC ("Lifestream"), whose registered agents are the Tannenbaum Defendants and which does business as TweedLeaf. *Id.* at ¶¶ 14, 111. On September 10, 2019, JW Colorado registered the "TWEEDLEAF" trademark and service mark. *Id.* at ¶ 112.

### E.    Sensoria Inquires About its Investment

Sensoria became concerned that other investors were acquiring ownership of Clover Top Holdings, Inc. in a way that was diluting its investment. *Id.* at ¶¶ 100–101. Sensoria received no substantive answers or information from Clover Top Holdings, Inc. or its officers. *Id.* at ¶¶ 100, 102. In February 2019, Kaweske told Morton that events and circumstances had rendered Sensoria's investment "no longer relevant." Kaweske added that "Technically, I don't have to give you anything because technically you don't own anything." *Id.* at ¶ 104. Evangelista threatened to countersue Plaintiffs, claiming that his losses are ten times greater. *Id.* at ¶ 116.

An attempt at private resolution was unsuccessful. *Id.* at ¶ 106. A demand letter yielded no

substantive relief. *Id*. at ¶ 116.

Sensoria believes that Clover Top Holdings, Inc.'s "assets, holdings, and subsidiaries . . . have been transferred away," rendering its investment irrelevant. *Id*. at ¶ 103. "Sensoria has not received back any of its initial investment, let alone any return on that investment, nor any documentation accounting for the investment apart from share certificates for common stock." *Id*. at ¶ 107. Instead, Kaweske "is now controlling the TweedLeaf brand and operations apart from Clover Top [Holdings, Inc.] and under his separate entities." *Id*. at ¶ 113. The Tweedleaf website lists six retail locations in Colorado. Lifestream and North Star have connections to that website (*id*.), and North Star includes "TweedLeaf" as one of its brands (*id*. at ¶ 113).

## II.    Defendants

The Kaweske Defendants consist of Kaweske and several entities under his control (the "Entity Defendants"). The Entity Defendants are JW Colorado, JW Trinidad, JW Ordway, MMJ, AJC, Sunlife, Ordway Farms, Durango, Lifestream, and TweedLeaf LLC (incorporated in Colorado). *Id*. at ¶ 119; ECF 157. Plaintiffs argue that it was through these entities that Kaweske siphoned off assets and cash that belonged to the Clover Top Holdings, Inc. venture. ECF 177 at 5.

Plaintiffs do not include Clover Top Colorado as an Entity Defendant even though Kaweske incorporated it. Nor has Clover Top Colorado appeared separately in this lawsuit. It appears to be in default. ECF 123.

Plaintiffs also sue Evangelista and the two entities, North Star and DJDW, associated with him ("Evangelista Defendants"). They allege that Evangelista managed Clover Top Holdings, Inc. with Kaweske, and like Kaweske, Evangelista converted its assets for his own benefit. Plaintiffs argue that the separate, competing business that Kaweske and Evangelista created for themselves

is in practical effect Clover Top Holdings, Inc. ECF 177 at 5. Plaintiffs bring no claims unique to them. The Evangelista Defendants filed their own Motion to Dismiss (ECF 168), but they simply adopted the arguments that the Kaweske Defendants raise. Therefore, the Court does not discuss the Evangelista Defendants separately.

Neither TweedLeaf Delaware nor Clover Top Holdings, Inc. has answered the Complaint, and both are in default. ECF 95 at ¶¶ 6, 13.

The Tannenbaum Defendants filed their own Motion to Dismiss. ECF 170.

Peterson has appeared. ECF 108, 121, 171. However, he does not move for dismissal nor join the other Defendants in their Motions to Dismiss.

## LEGAL STANDARDS

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Iqbal*, 556 U.S. at 679–80. Second, a court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*.

## ANALYSIS

Morton and Sensoria seek to recover their investment in Clover Top Holdings, Inc. Clover Top Holdings, Inc. also seeks redress for harm done to it, proceeding through Sensoria who is

acting on its behalf. Collectively, Plaintiffs allege that Defendants took various actions harmful to the business venture, for which they assert a variety of causes of action. Because Sensoria is the principal investor and the primary litigant, the Court will refer to just it rather than to the Plaintiffs on the whole, unless otherwise noted.

## I.      Illegality-Based Defenses and Bars to Recovery

In a previous ruling, *Sensoria, LLC v. Kaweske*, No. 20-cv-00942-MEH, 2021 WL 103020 (D. Colo. Jan. 12, 2021), the Court dismissed most claims. The overarching issue was Clover Top Holdings, Inc.'s direct involvement in the growing and selling of marijuana. While those activities may be legal under Colorado law, they are not under the federal Controlled Substances Act, 21 U.S.C. §§ 802, *et seq*. ("CSA"). *Id*. at *5. The Court noted Sensoria's failure to "explain how relief could be fashioned here that would not endorse or require illegal activity, or would be paid from an asset source independent of marijuana." *Id*. at *6. Nor did Sensoria "identify any particular claim of relief that is unaffected by the [illegality] affirmative defense." *Id*. However, because there was "the potential that they may be able to seek relief that does not implicate federal marijuana laws," the Court gave Sensoria leave to amend the complaint. *Id*. at *15.

The SAC follows that ruling. Sensoria largely repeats the same causes of action without specifically repleading any of them in a way to account for the illegal nature of the underlying business venture. Instead, Sensoria attempts to avoid the illegality issue by reframing the relationship with Clover Top Holdings, Inc.

Defendants again move for dismissal. Like Sensoria, they do not discuss how illegality affects each particular cause of action, but rather, they argue that it bars Sensoria's attempt at relief as a general matter.

## A.	Sensoria's Intention

The SAC casts Sensoria's involvement in the enterprise as that of a passive investor whose intention was to invest in a lawful business. Sensoria concedes intentionally and knowingly investing in a cannabis operation, but because there are aspects of cannabis and hemp that do not violate the CSA, the investment could have been lawful under federal law. Moreover, Sensoria relied on Defendants' specialized knowledge to operate Clover Top Holdings, Inc. in a CSA-compliant manner. Sensoria does not allege that Clover Top Holdings, Inc. was unlawful under Colorado law. To the extent it may have violated federal law, Sensoria holds Defendants, who it alleges acted unilaterally and without their knowledge or authorization, responsible.

Sensoria emphasizes that on Rule 12(b)(6) review, the Court must accept as true its representation that it intended to invest in and fund only a lawful business. The Court accepts the allegation as true, as it does for the SAC generally. That includes the description of the initial solicitation "pitch" to invest in a substantial marijuana cultivation, processing, and retail operation. The Court likewise accepts as true the allegation that Morton visited the business before making the second investment. The full scope of the allegations shows that Defendants did not deceive Sensoria into unwittingly investing in a business that unexpectedly turned out to involve illegal marijuana. There was at least some indication that marijuana would be involved and to a substantial degree, even if Sensoria subjectively did not appreciate that fact nor the full range of the legal consequences.

Regardless of Sensoria's subjective intent, the SAC describes the investment in a way that implicates the CSA. The pleading shows its direct involvement[1] in the growing, processing, and

---

[1] The SAC also contains the allegation that Clover Top Holdings, Inc. never actually had any assets in the first place. ECF 155 at ¶ 45(b). Otherwise, the SAC suggests that Clover Top Holdings, Inc. was not an entirely void business from the beginning. Even if they later were

selling of marijuana. Had Defendants managed it as represented, Sensoria would have benefitted financially from those activities. Thus, the SAC raises the same CSA concerns that *In re Malul*, 614 B.R. 699 (D. Colo. 2020), *Bart St. III v. ACC Enters., LLC*, No. 17-cv-00083, 2020 WL 1638329 (D. Nev. Apr. 1, 2020), and *Polk v. Gontmakher*, No. 18-cv-01434, 2020 WL 2572536 (W.D. Wash. May 21, 2020) had.

How the marijuana aspect of the business affects the claims' legal viability and the means of redress remains a relevant question. The intention to invest in a fully lawful business does not render the illegality issue moot. Consequently, the reframing of Sensoria's relationship with Clover Top Holdings, Inc. does not by itself preclude dismissal.

## B.    Breach of Contract

Sensoria emphasizes that the illegality affirmative defense is grounded in contract law (ECF 177 at 8, n.2), and it renders void and unenforceable a contract that violates public policy, *In re Malul*, 614 B.R. at 706, although not automatically so, *Ginsburg v. ICC Holdings, LLC*, No. 3:16-CV-2311-D, 2017 WL 5467688, at *8 (N.D. Tex. Nov. 13, 2017). The parties dispute whether the affirmative defense bars Sensoria's ability to sue Defendants for breach of contract. Indeed, Sensoria devotes the majority of its Response (ECF 177) to arguing against its application under the circumstances of this case. However, there is no need for the Court to resolve this dispute, because there is no viable breach of contract claim in the first place.

The SAC contains only one breach of contract claim (the Sixth Cause of Action) brought against Clover Top Holdings, Inc. However, the claim is too conclusory to survive Rule 12(b)(6) review. Sensoria alleges that it "entered into one or more valid contracts with Clover Top

---

siphoned off, the pleading indicate that it owned some marijuana-related assets and that some cultivation and retail activities could be attributed to it, even if only temporarily.

[Holdings, Inc.] for the purchase and sale of [its] stock" (ECF 155 at ¶ 162) but without specifically identifying those contracts. The only one of record is the Subscription Agreement, and Sensoria is not party to it. It was Morton who signed it. *Id*. at ¶ 46. Sensoria next asserts that Clover Top Holdings, Inc. "breached its contract obligations by its actions as set forth herein." *Id*. at ¶ 162. Exactly what contractual obligation Clover Top Holdings, Inc. did not perform is not expressly stated. Nor is any breach readily apparent. Sensoria does not plead that Clover Top Holdings, Inc. failed to issue the shares that either Morton or it had bought.

In other words, the same pleading defects remain that the Court identified in its prior ruling. Dismissing the breach of contract claim on *Twombly*/*Iqbal* grounds in turn renders Defendants' reliance on the illegality affirmative defense moot.

### C.      Non-Contract Claims

There is no contractual dispute over Sensoria's investment in Clover Top Holdings, Inc. It received all purchased shares, unlike the situation in *Kush, Inc. v. Van Vranken*, No. 2:20-CV-649 JCM, 2020 WL 8371452, at *1 (D. Nev. June 19, 2020) which did concern the direct breach of an investment contract. Indeed, it is that equity interest that gives Sensoria standing to sue Defendants for redress. The allegation that Defendants "breached the investment contract" simply restates Sensoria's grievance about how Defendants falsely solicited the investment, mismanaged the business, and took assets for their own benefit. In the previous ruling, the Court dismissed those additional causes of action because Sensoria did not argue against extending the illegality affirmative defense to them. *Sensoria*, 2021 WL 103020 at *6. The parties still do not address how the CSA affects the legal viability of each claim, such as for fraud, securities law violations, or unjust enrichment, specifically.

The mere fact of marijuana's involvement does not by itself automatically preclude

Sensoria from seeking redress. As the Court recognized in the prior ruling, case law suggests no such hard-and-fast rule. *Id*. Indeed, one federal court proceeded to consider whether a plaintiff pleaded the elements of his additional fraud and RICO claims, even though the lawsuit concerned a medical marijuana business investment. *Ginsburg*, 2017 WL 5467688 at *10. The Tenth Circuit held that the Fair Labor Standards Act applies to the marijuana industry employers based on the statute's plain language and express purpose. *Kenney v. Helix TCS, Inc*., 939 F.3d 1106 (10th Cir. 2019). Defendants must do more than simply point to the marijuana aspects of the enterprise to have the claims dismissed.

There also is the issue of whether there is a permissible form of relief that the Court may grant. As noted above, a court may not compel performance of a contract term that would require a party to violate the law. Likewise, Chief Judge Romero of the United States Bankruptcy Court of the District of Colorado has declined to administer marijuana-related assets or confer a federal benefit to debtors engaged in ongoing federal law violations. *In re Malul*, 614 B.R. at 713–14; *In re Way to Grow, Inc*., 597 B.R. 111 (D. Colo. 2018). Another bankruptcy court likewise declined to protect a debtor's continued operation of a marijuana business. *In re Johnson*, 532 B.R. 53, 56–57 (W.D. Mich. 2015). In its previous ruling, the Court dismissed Sensoria's claims for not explaining how relief could be fashioned "that would not endorse or require illegal activity, or would be paid from an asset source independent of marijuana." *Sensoria*, 2021 WL 103020 at *6.

Sensoria now emphasizes how certain assets at issue such as buildings and land are not themselves inherently unlawful. However, they are being used for marijuana, and technically speaking, at least, could be subject of criminal forfeiture. *In re Malul*, 614 B.R. at 712. Sensoria does not explain how the Court may award them as a form of compensation. Alternatively, compensation may be paid from a non-marijuana income source. *Ginsburg*, 2017 WL 5467688 at

*8 (finding that a court may compel a loan payment due to the fungibility of currency); *Mann v. Gullickson*, No. 15-cv-03630, 2016 WL 6473215, *7 (N.D. Cal. Nov. 2, 2016) (recognizing that a court may order payment from lawful sources).

Assuming the availability of some permissible source of compensation, the injury Sensoria suffered must be cognizable and legitimate. It is Sensoria's ownership interest in the marijuana business and the recovery of the benefit of its investment that underlies this lawsuit. The relief it seeks directly concerns the business. However, the Court may not vindicate equity in or award profits from a business that grows, processes, and sales marijuana. *Sensoria*, 2021 WL 103020 at *6 (citing *in re Malul*, 614 B.R. 699 (D. Colo. 2020); *Polk v. Gontmakher*, No. 18-cv-01434, 2020 WL 2572536 (W.D. Wash. May 21, 2020); *J. Lilly, LLC v. Clearspan Fabric Structures Int'l, Inc*., No. 18-cv-01104, 2020 WL 1855190 (D. Or. Apr. 13, 2020)).

Key aspects of this lawsuit concern activities that represent either actual ongoing CSA violations (by Defendants) or the attempt to recover the investment in an enterprise (Clover Top Holdings, Inc.) whose activities implicate the CSA. Marijuana is not an indirect or tangential aspect of the dispute. It lies at the heart of the business and thus the lawsuit. Even if Sensoria may litigate its various causes of action, it demonstrates no form of redress that this federal court may provide. For this reason, the Court dismisses the claims based on theft (Eleventh and Twelfth Causes of Action), fraud (Seventh and Thirteenth Causes of Action), negligent misrepresentation (Eighth Cause of Action), and breach of fiduciary (Fifth, Ninth, and Fifteenth Causes of Action). The Court likewise dismisses the civil conspiracy claim (Fourteenth Cause of Action) and the Unjust Enrichment/Constructive Trust claim (Sixteenth Cause of Action). Because Sensoria does not argue how the securities law-based claims are unaffected by the CSA issue, the Court dismisses them (Second, Third, and Fourth Causes of Action) as well.

### D. Equitable Relief

In its First Cause of Action, Sensoria requests "an accounting of all relevant entities" of "how much, if any, money is due to it from defendants in excess of the $225,000.00 plus interest it invested in Clover Top [Holdings, Inc.]" ECF 155 at ¶ 134. In other words, Sensoria seeks an accounting of any equity or profit above the principal invested. Although the CSA generally precludes the Court from awarding any financial benefit from marijuana, the act of *accounting* for that financial benefit does not directly implicate the CSA in the same way.

The First Cause of Action also contains a request for "a determination that Sensoria is entitled to the return of its investment in Clover Top [Holdings, Inc.] with interest." *Id*. In the SAC's Prayer for Relief, Plaintiffs ask for "rescission of Sensoria's purchase of shares in Clover Top [Holdings, Inc.] and return of its investment" as an alternative to compensatory damages. *Id*. at 59. Defendants make no specific legal argument for why the Court may not as a matter of law return the investment principal to Sensoria (assuming, of course, Sensoria can establish entitlement to such relief and a permissible payment source). Case law provides no clear guidance. One case declined to return the plaintiff's investment in a marijuana business under an unjust enrichment theory. *Bart St*., 2020 WL 1638329 at *9. It reasoned that buying equity violates the CSA because it allows the investor to profit from marijuana and permitting recovery would give investors increased confidence. *Id*. The investment itself may violate the CSA. *In re Malul*, 614 B.R. at 711–12. On the other hand, at least in the contract enforcement context, *Kush, Inc*., 2020 WL 8371452 at *5, considered the need to avoid unjustly enriching a defendant or disproportionately penalizing a plaintiff. That point of consideration might support rescission under the appropriate circumstances. Because Defendants do not demonstrate how the rescission claim fails as a matter of law, the Court declines to dismiss it.

In its Response (ECF 177), Sensoria suggests enjoining Defendants to conduct their business enterprise in a CSA-compliant manner. That was the approach *in re Johnson*, 532 B.R. 53 (W.D. Mich. 2015) used, but in a wholly different situation. Mr. Johnson was elderly and in poor health. He sought help to stay in his home, retain his vehicle, and keep the electricity turned on despite financial difficulty. The bankruptcy court gave him the option to cease completely his very small medical marijuana business so that he may avail himself of its protection. Enjoining Defendants here superficially might obviate the illegality concerns by sanitizing their assets, but the request suffers from its own defects. Defendants oppose such a measure, and Sensoria does not plead the elements needed to obtain an injunction against them. For example, it does not establish how Defendants' future operations will cause it particularized, concrete injury. *Lippoldt v. Cole*, 468 F.3d 1204, 1217–18 (10th Cir. 2006). Nor may a private citizen seek injunctive relief to enforce the CSA. *Hickenlooper*, 859 F.3d at 902 (concluding that a private "plaintiff cannot maintain a cause of action—in law or in equity—against any defendant for violating the CSA").

The Court dismisses the First Cause of Action with respect to those requests that would have the practical effect of transferring marijuana-related assets to Sensoria and to the extent Sensoria asks to enjoin Defendants from all further CSA-infringing conduct. The Court does not dismiss the requests for an accounting and rescission.

## II.     RICO

Sensoria accuses Defendants of engaging in activity that violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–65 ("RICO"). RICO creates a private cause of action for injuries to a plaintiff's business or property. 18 U.S.C. § 1964(c). The elements of a civil RICO claim are (1) racketeering activity in violation of 18 U.S.C. § 1962(c), (2) injury to the plaintiff's business or property, and (3) a causal relationship between the defendants' violation and

the plaintiff's injury. *Hickenlooper*, 859 F.3d at 881. The Court discusses those elements and their definitions in turn below.

## A.    Racketeering Activity

To establish the first element, Sensoria must plausibly allege that Defendants each (a) conducted the affairs (b) of an enterprise (c) through a pattern (d) of racketeering activity. *Id.* at 882. The statute defines "racketeering activity" by a list of predicate offenses which include CSA violations. *Id.* (citing 18 U.S.C. § 1961(1)(A), (D)).

The kind of racketeering activity that Sensoria pleads in the SAC is dealing in a controlled substance in violation of the CSA, "namely the growing, selling, and distributing of marijuana, and/or the aiding and abetting in furtherance thereof." ECF 155 at ¶ 213. To the extent Sensoria premises the RICO claim on marijuana activities, Defendants invoke the equitable defense of *in pari delicto*, which reflects the common law principle that a plaintiff's recovery may be barred by his own wrongful conduct. In the civil RICO context, the defense applies if the plaintiff was an active participant in the racketeering activity and dismissal is consistent with RICO's policy goals. *Inge v. McClelland*, 725 F. App'x. 634, 639 (10th Cir. 2018).

To show the first prong, Defendants point to Senoria's own ownership of a marijuana business. Sensoria denies investing with the knowledge that it was an unlawful operation, but even if the Clover Top Holdings, Inc. enterprise implicates the CSA, it still would not be *in parti delicto* conduct. Clover Top Holdings, Inc. is not the marijuana enterprise subject of the RICO claim. Because Sensoria is not an active participants in the same marijuana business, Defendants may not rely on the defense.

In its Response (ECF 177), Sensoria describes a different kind of racketeering activity. There, they refer to how Defendants fraudulently induced the investment in Clover Top Holdings,

Inc. (on the promise that it would be a lawful cannabis business) and then converted its assets for the benefit of their competing illegal marijuana operation. Defendants concede that the *in pari delicto* defense does not apply to this framing of the RICO claim. Sensoria did not participate in the fraud; it was the scheme's victim. Moreover, a causal relationship[2] would exist, at least superficially, between the scheme and Sensoria's injury.

However, this version of the racketeering claim raises the question of whether the alleged wrongdoing counts as one of RICO's predicate acts. Securities fraud is not a recognized predicate offense. 18 U.S.C. § 1964(c); *Bixler v. Foster*, 596 F.3d 751, 759–60 (10th Cir. 2010). Nor are common law fraud, *Missaghi v. Apple, Inc.*, No. CV 13-02003 GAF, 2013 WL 12200086, at *7 (C.D. Calif. Nov. 1, 2013), or garden-variety business disputes, *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992), actionable. Until Sensoria shows how the alleged fraudulent acts are covered by RICO, it does not state a plausible claim.

## B. Pattern

Assuming that Sensoria could demonstrate a predicate offense, it also must plead sufficient facts to show a pattern, *i.e.*, "a series of related predicates that together demonstrate the existence or threat of continued criminal activity." *Hickenlooper*, 859 F.3d at 882. "The threat of continuity may be established by showing that the predicate acts or offenses are part of any ongoing entity's regular way of doing business." *Id*. The "pattern" element has two parts. First, the multiple predicate acts must relate to each other. The relationship test requires showing how the predicate acts "have the same or similar purpose, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Bixler*,

---

[2] To satisfy the causation element, Sensoria must plead that Defendants' violation was not only a "but for" cause of its injury, but the proximate cause as well. *Hickenlooper*, 859 F.3d at 889. The focus of the inquiry is on whether the alleged violation *directly* caused the injury. *Id*. 889–91.

596 F.3d at 761. The second requirement of "continuity" is met when there is "long-term criminal activity." *Id*. Continuity may be either a closed period of repeated conduct or an open period that projects past conduct into the future with the threat of repetition. *Id*.

*Bixler* found no pattern in the allegation "that defendants engaged in a single scheme to accomplish the discrete goal of transferring [the assets of the corporation that plaintiffs owned] to another corporation [for defendants' sole benefit]." *Id*. *Ginsburg* similarly found no requisite continuity or pattern where the alleged wrongdoing consisted of a single scheme to persuade the plaintiff to invest in their medical marijuana business. 2017 WL 5467688 at *22. As in *Bixler* and *Ginsburg*, Sensoria pleads only a single scheme of asset conversion that has been completed, not an ongoing criminal enterprise.

## C. Injury

The civil RICO cause of action provides redress for injury to business or property. *Hickenlooper*, 859 F.3d at 885. At issue here is a business in which Sensoria bought stock and whose assets Defendants took for their personal benefit. Were the injury limited to the Clover Top Holdings, Inc. corporate entity, then only it would have standing. *Bixler*, 596 F.3d at 758–59 (finding that shareholders lack standing to bring a civil RICO claim for injury to the corporation such as diminution of share value); *Ginsburg*, 2017 WL 5467688 at *22, n.28 (dismissing the claim "to the extent it is based on conduct that would have been actionable as fraud in the purchase or sale of securities). Sensoria would have no derivative standing.

Regardless of which Plaintiff suffered a business or property injury, the injury also must be cognizable. RICO provides no redress for injury to a property interest that is contrary to public policy or the law. *Doe v. Roe*, 958 F.2d 763, 768 (7th Cir. 1992). The business or property interests Sensoria seeks to vindicate are in a business that would grow, process, and sell marijuana. Even if

Sensoria did not intend to invest in an illegal business, that was the nature of its operations. Those aspects of Clover Top Holdings, Inc.'s activities themselves would constitute a predicate RICO offense.

### D. Form of Redress

Sensoria maintains that in addition to seeking monetary relief, it also seeks to enjoin Defendants from operating their marijuana business in violation of the CSA. However, Sensoria does not overcome the Tenth Circuit's "considerable doubt [whether] equitable relief is available to private RICO litigants under any circumstances." *Switzer v. Coan*, 261 F.3d 985, 992, n.14 (10th Cir. 2001).

### E. Summation

The Seventeenth Cause of Action recites the elements of a civil RICO claim, but to satisfy the *Twombly/Iqbal* pleading standard and survive Rule 12(b)(6) review, it must allege a plausible violation. Sensoria discusses the claim in greater depth in its Response (ECF 177). While that discussion may describe a general fraud conspiracy, it falls short of the very specific elements that define a RICO claim. Consequently, the Court dismisses it.

## III. Tannenbaum Defendants

The essence of the SAC, as the Tannenbaum Defendants put it, is how Kaweske and Peterson solicited Sensoria to invest in Clover Top Holdings, Inc. and "the big plans [for it] to become a profitable cannabis business." ECF 184 at 1. As it turned out, Sensoria realized no financial benefit from the investment. The Tannenbaum Defendants stress that Clover Top Holdings, Inc. never had any assets of its own and did not meet licensing requirements to operate in the first place. Nor did it take any steps to maintain its corporate status with either Delaware (its place of incorporation) or Colorado (its place of business). *Id*. at 1–2. Sensoria seeks redress from

Clover Top Holdings, Inc.'s attorneys for their alleged share of responsibility for the venture's failure.

### A.     Legal Malpractice

Clover Top Holdings, Inc. retained the Tannenbaum Defendants as its attorneys for legal services "regarding the purchase and/or sale of marijuana licenses" and "for both cannabis and corporate law" matters generally. ECF 155 at ¶ 33. They became Clover Top Holdings, Inc.'s legal counsel just one month after its incorporation and before Kaweske and Peterson began soliciting Morton's initial investment. *Id.* at ¶¶ 27, 33, 41. The Tenth Cause of Action is Clover Top Holdings, Inc.'s claim that they fell short of their duty of care to its detriment. Legal malpractice may be shown either through an act of negligence in the provision of a service or a breach of a fiduciary duty owed to the client. *Parks v. Edward Dale Parrish LLC*, 452 P.3d 141, 146 (Colo. App. 2019); *Aller v. Law Office of Carole C. Schriefer. PC*, 140 P.3d 23, 27 (Colo. App. 2005). Clover Top Holdings, Inc. alleges both kinds of wrongdoing.

Regarding negligent acts, Clover Top Holdings, Inc. alleges that the Tannenbaum Defendants failed "to maintain [its] corporate status and assure compliance with governing law to keep [it] a viable entity." ECF 155 at ¶ 179. It alleges that they did not ensure its compliance with federal law (*id.*), presumably in reference to the CSA. There also may be an issue related to its failure to meet the requirements either for holding its own marijuana licenses or for allowing Morton and Sensoria to invest in it. Clover Top Holdings, Inc. does not say that it specifically requested legal advice or services on any of these matters, but the SAC reasonably permits the inference that those tasks could have been within the general scope of the retainer.

While the SAC contains just the minimum allegations of professional negligence, it goes further in asserting a breach of fiduciary duty. Despite being its retained attorneys, Clover Top

Holdings, Inc. alleges that the Tannenbaum Defendants helped the other Defendants in ways that were contrary to its interests. They helped with transactions that siphoned off assets and represented competing businesses. The allegations raise disloyalty and conflict of interest concerns. Citing *Moguls of Aspen, Inc. v. Faegre & Benson*, 956 P.2d 618, 621 (Colo. App. 1997), the Tannenbaum Defendants argue that Clover Top Holdings, Inc. may not sue it for both legal malpractice and breach of fiduciary duty when the alleged wrongdoings occurred solely within the context of the attorney-client relationship. Clover Top Holdings, Inc. identifies no other kind of relationship, such as a corporate officer, from which a fiduciary duty would arise. Because it already is subsumed within the legal malpractice claim, the Court dismisses the breach of fiduciary duty claim as a separate cause of action.

### B.      Impossibility

The Tannenbaum Defendants argue that they could not have caused injury to Clover Top Holdings, Inc. because it never was a viable business in the first place.[3] "In other words, it was impossible for Clover Top [Holdings, Inc.] to carry out the scheme of investment that the Plaintiffs describe in their [SAC]." ECF 184 at 4. Because it always was a defunct enterprise, they never actually provided it any legal services. However, in making that argument, the Tannenbaum Defendants either exceed the scope of the SAC's allegations or make assertions contrary to them.

At one place in the SAC, Plaintiffs say that Clover Top Holdings, Inc. "did not in fact own the cannabis-related properties or entities that Kaweske and Peterson represented it did." ECF 155 at ¶ 45(b). On balance, however, the SAC supports the inference that Clover Top Holdings, Inc. had at least some marijuana-related assets for some period of time. The Tannenbaum Defendants

---

[3] If the Tannenbaum Defendants are correct that Clover Top Holdings, Inc. never was a valid business concern and never had any marijuana-related assets, then the CSA may have a less preclusive effect on Plaintiffs' claims against the other Defendants.

say that Colorado law prevented Clover Top Holdings, Inc. from holding a marijuana license either directly in its own name or indirectly through ownership of a licensee. However, Plaintiffs plead that Kaweske held Clover Top Holdings, Inc.'s licenses and that the Tannenbaum Defendants were hired to help with cannabis licensing matters. There were problems with Clover Top Holdings, Inc.'s state registrations, but the pleadings leave unclear how that would have affected operations. For Rule 12(b)(6) purposes at least, the allegations show Clover Top Holdings, Inc. was a sufficiently viable entity (viable enough to retain legal counsel) that could be harmed by an act of legal malpractice by its attorneys.

### C.    Civil Conspiracy; Aiding and Abetting; and Unjust Enrichment

Sensoria also ties the Tannenbaum Defendants to the alleged wrongdoings by the other Defendants. It does so through a theory that the Tannenbaum Defendants helped the others carry out their scheme to defraud them of their investment. However, the only link the Tannenbaum Defendants had with the scheme was to assist with tasks at the others' behest. In other words, their contribution to the greater scheme was limited to their role as legal counsel for the other Defendants. Those activities already underlie the professional malpractice claim. Sensoria alleges no *additional* role that the Tannenbaum Defendants played in the scheme.

### 1.    Civil Conspiracy

Sensoria includes the Tannenbaum Defendants in the Fourteenth Cause of Action for civil conspiracy. It alleges that Defendants together sought "to deprive Clover Top [Holdings, Inc.] of assets that rightfully belong to [it], and to deprive [its] shareholders of their value in [it]." ECF 155 at ¶ 199. As the Court highlighted in the prior dismissal order, an unlawful "conspiracy" consists of more than common action. It is defined by a meeting of the minds and separate, independent conduct in furtherance of the unlawful goal. *Sensoria*, 2021 WL 103020 at *11. Sensoria amended

the claim to expressly allege a conspiratorial agreement. ECF 155 at ¶ 200. It added the allegation that the Tannenbaum Defendants acted "for their own benefit by charging for services adverse to [it] and profiting thereby." *Id*. at ¶ 201.

The SAC may plead the elements of the cause of action, but it does not satisfy the *Twombly/Iqbal* pleading standard. Sensoria pleads no involvement in the fraud scheme separate and apart from their role as the other Defendants' attorneys. There is no indication of any direct financial benefit from the scheme (even if the other Defendants paid their legal fees from Clover Top Holdings, Inc. assets). In other words, Sensoria does not demonstrate a form of wrongdoing that differs from what the legal malpractice claim covers. The same essential pleading defect that was subject of the previous dismissal order remains. *Sensoria*, 2021 WL 103020 at *11–12. The Court again finds that Sensoria does not plead a plausible civil conspiracy claim against the Tannenbaum Defendants.

### 2.    Aiding and Abetting Breach of Fiduciary Duty

The Fifteenth Cause of Action is for aiding and abetting a breach of fiduciary duty, which Sensoria brings both directly and derivatively on Clover Top Holdings, Inc.'s behalf. The Tannenbaum Defendants argue that the claim suffers from two defects. First, there is no underlying breach of fiduciary duty to serve as its predicate, and because Clover Top Holdings, Inc. never was a viable business, no such breach would have caused it injury anyway. However, the Court assumes that a claim plausibly could be made that a fiduciary Defendant, such as Kaweske or Peterson, did breach a duty owed to Clover Top Holdings, Inc.

It is a moot point because Sensoria also must establish that the Tannenbaum Defendants assisted the others in causing that breach. The gravamen of the aiding and abetting claim is their "knowing participation" in the fiduciary's breach of trust. *Holmes v. Young*, 885 P.2d 305, 308

(Colo. App. 1994). This is the second aspect of the cause of action, and the Court agrees with the Tannenbaum Defendants that Sensoria does not meet it. There is insufficient allegation of how they knew of the others' actions and purposefully participated in the scheme. In that way, the aiding and abetting claim fails against the Tannenbaum Defendants for the same reason the civil conspiracy claim does.

### 3. Unjust Enrichment

The Sixteenth Cause of Action is a claim of unjust enrichment and constructive trust that Sensoria, both directly and derivatively, brings against all Defendants. The Court dismissed the prior version of the claim because Sensoria did not "establish how the Tannenbaum Defendants benefitted from" the alleged wrongdoing. *Sensoria*, 2021 WL 103020 at *14. Citing *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1260–61 (D. Colo. 2014), the Court noted how the cause of action requires the return of a benefit that a wrongdoer "in equity and good conscience . . . ought not to keep." *Id*. The SAC does not identify what benefit the Tannenbaum Defendants *wrongly* retained. ECF 155 at ¶¶ 208–211. In its Response, Sensoria argues that any payment of legal fees made from Clover Top Holdings, Inc. assets would have unjustly enriched the Tannenbaum Defendants. ECF 178 at 15. Even if others did pay the Tannenbaum Defendants from assets taken from Clover Top Holdings, Inc., the conversion already occurred. The other Defendants' use of those assets in turn to pay their legal bill does not make the Tannenbaum Defendants' retention of that payment unjust.

### 4. Summation

Dispositive to the above three causes of action is the distinction between whether the Tannenbaum Defendants' role was limited to providing legal services at the request of others or whether they acted as equal participants in the greater fraud and theft scheme. The SAC does not

go so far as to show them to be conspirators or knowing helpers. Nor does the SAC plausibly plead how they derived a direct benefit from the scheme beyond their fee for the legal services rendered. Consequently, the Court dismisses these three claims as raised against the Tannenbaum Defendants.

## IV.     Leave to Amend

Dismissal of a case is a harsh remedy, and as a general rule, a litigant should have the opportunity to amend the complaint and cure pleading defects. Fed. R. Civ. P. 15(a)(2). The Court does not find that filing a Third Amended Complaint would be futile. As in *Ginsburg*, 2017 WL 5467688 at *23, Plaintiffs expressly ask for the opportunity to amend, and it is possible they still may be able to cure the defects. Given the novelty and complexity of the legal issues presented, the Court gives Plaintiffs leave to do so a last time.

## <u>CONCLUSION</u>

Sensoria says it is the victim of fraud, theft, and mismanagement of its investment, and it expresses that allegation of wrongdoing through several different causes of action. However, because the investment implicates the CSA, the Court's ability to provide redress is limited. Sensoria does not tailor its claims to avoid the illegality concern or explain how it may litigate them in federal court. Therefore, the Court dismisses the claims that raise illegality concerns. In addition, there are claims for which dismissal is warranted because Sensoria does not plead them in a plausible fashion irrespective of the CSA issue.

Accordingly, for the above reasons, the Kaweske Defendants' Motion to Dismiss [filed March 2, 2021; ECF 165], the Evangelista Defendants' Motion to Dismiss [filed March 5, 2021; ECF 168], and the Tannenbaum Defendants' Motion to Dismiss [filed March 5, 2021; ECF 170] are **granted in part** as follows:

The Court dismisses all claims (except the Sixth and Tenth Causes of Action) on the basis of illegality. The Court likewise dismisses the First Cause of Action except the requests for an accounting and rescission.

The Sixth (breach of contract) and Seventeenth (RICO) Causes of Action are dismissed because Sensoria does not plead them plausibly.

The Fourteenth (civil conspiracy), Fifteenth (aiding and abetting breach of fiduciary duty), and Sixteenth (unjust enrichment) Causes of Action are dismissed as raised against the Tannenbaum Defendants. Sensoria does not state plausible versions of those claims against them. The Court also dismisses the breach of fiduciary claim that is included in the Tenth Cause of Action.

The above dismissals are without prejudice, and Plaintiffs have leave to file a Third Amended Complaint.

The Motions are **denied** with respect to the Tenth Cause of Action for legal malpractice and the requests for an accounting and rescission in the First Cause of Action. These are the two remaining claims in this case.

SO ORDERED.

Dated at Denver, Colorado, this 20th day of May, 2021.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge