# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-00942-MEH

SENSORIA, LLC, et al.,

                         Plaintiffs,

     vs.

JOHN D. KAWESKE, et al.,

                         Defendants.

**PLAINTIFFS' JOINT RESPONSE BRIEF IN OPPOSITION TO: (1) JOHN KAWESKE AND THE ENTITY DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT, AND (2) WELBY EVANGELISTA, NORTH STAR HOLDINGS, AND DJDW, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT**

**(ORAL ARGUMENT REQUESTED)**

**INTRODUCTION**

The Defendants[1] ask this Court to dismiss the Verified Third Amended Complaint[2] for three reasons. Because none of the reasons is supported by law or the alleged facts in this case, the Court should deny the motion.

First, the Defendants argue that the complaint should be dismissed based on the affirmative defense of illegality. But the Executive and Legislative Branches of the Federal Government no longer treat marijuana as an illegal substance in states that have legalized its use. For this reason, the Court should not treat marijuana as illegal for the purposes of the illegality defense to a contract.

Additionally, even if the Court treats marijuana as an illegal substance in this case, it should nevertheless reject Defendants' illegality defense because Plaintiffs do not allege the existence of a contract to engage in illegal conduct, and the current version of Plaintiffs' complaint does not contain any allegation to the contrary. Rather, Plaintiffs have alleged that they intended to invest in a legal business; that they trusted Defendants' repeated assertions that the business was legal; and that the Defendants harmed Plaintiffs, in part, by using that

---

[1] After Defendants John Kaweske and the Entity Defendants filed their motion to dismiss, Defendants Welby Evangelista, North Star Holdings, and DJDW, LLC filed a separate motion to dismiss. This opposition responds to both motions. Plaintiffs note that some of the counter-arguments raised by Plaintiffs in this opposition have already been considered by the Court. Plaintiffs acknowledge this but include them in this opposition in an attempt to have the Court reconsider its previous rulings or, if this is not successful, to preserve the arguments for appeal.

[2] Any reference herein to the plaintiffs' "pleading," "pleadings," "complaint," "amended complaint," and like terms refers to the Verified Third Amended Complaint and Jury Demand (Dkt. 206). References to paragraph numbers throughout are to that pleading. Also, any reference herein to "Plaintiffs" refers to all plaintiffs and references to the "Defendants" refers to the Defendants unless the context otherwise indicates.

investment to fund illegal activities. Plaintiffs' complaint also shows a judgment can be funded from legal, non-marijuana assets or, at minimum, that some of Plaintiffs' requested relief can be ordered without linking that judgment to illegal assets or the profits from an illegal business. For these and other reasons discussed below, the Defendants' illegality affirmative defense fails.

Second, Defendants argue that Plaintiffs' civil RICO claims should be dismissed. For the reasons discussed below, this argument also fails.

Finally, Kaweske argues that Plaintiffs' breach of contract claim against him should be dismissed due to a lack of consideration. But in exchange for Kaweske's promise that the business would operate legally, Plaintiffs provided the benefit of their investment in Clover Top. As Plaintiffs explain below, under Colorado law this constitutes sufficient consideration for the contracts with Kaweske. Accordingly, Kaweske's contract argument should be rejected.

## ALLEGATIONS IN THE COMPLAINT

From October 2015 to September 2017, Defendants John Kaweske, Chris Peterson, and Welby Evangelista solicited investments from the Plaintiffs, as passive investors, for a cannabis business. According to Defendants Peterson and Kaweske, the business would be operated under the parent corporation, or "mother ship," Clover Top Holdings, Inc. ("Clover Top"). Defendants represented that Clover Top would own companies and assets dedicated to the cannabis business. Defendants also represented that this business would be legal under state and federal law. In soliciting Plaintiffs' investments, Defendants represented to at least one investor that the business would be "on the up and up." (¶ 37.) They also emphasized in their solicitations that they already had multiple business licenses and trademarks (including federal trademarks) and that the business was already operating openly. (¶¶ 37, 42, 43.) And they presented to all

Plaintiffs a written slide-show presentation that asserted again and again that the business would

be legal, including the assertions that Clover Top was a corporation established "in the

burgeoning legal cannabis industry," that Clover Top intended to establish a "national brand,"

that Clover Top owned a "registered trademark . . . for both retail and online sales of medicinal

botanicals and nutraceuticals nationwide," that they were already selling "proprietary hemp-

based cannabidiol (CBD) products, . . . that [were] currently legal to sell nationwide," that "as of

2014, the legal aspects of the national cannabis market constituted a $4.57 billion industry," that

"the 'U.S. Legal Marijuana Markets' would grow to $17.23 billion from 2014 to 2020," that

"[t]he legal cannabis industry is the fastest-growing segment of the United States economy," that

" its '[h]emp-derived CBD products can be legally purchased both in-store and online

nationwide,'" that they intended to establish a premier "medical cannabis brand—initially in

Colorado and then nationwide," that Clover Top would "disrupt the stigma of illicitness

associated with cannabis," and that Clover Top was "prepared for future nationwide expansion as

Federal and state laws quickly change." (¶ 45.)

Based on the assertions of legality and that Clover Top would be the holding company of

all of Defendants' cannabis-related businesses, Plaintiffs invested in Clover Top.[3]

But Defendant Kaweske both outright lied and omitted information. For example, in

soliciting Plaintiffs' investments he did not disclose the fact that he had been barred from the

---

[3] Plaintiffs fall into two groups: the Plaintiffs in the first group were not familiar with the
cannabis industry or the intricacies of federal cannabis law and relied on the representations
made by Defendants that the business would be legal. *See* Third Amended Complaint ¶¶ 37–45.
The second group understood that they were investing in a business that was legal in Colorado
but not necessarily under federal law. *See id.* ¶¶ 46–47. Accordingly, where any argument
contained herein depends on the lack of knowledge regarding illegality, it applies only to the first
group of Plaintiffs.

securities industry for repeated instances of securities fraud. In fact, he took affirmative steps to hide this fact, including by hiring a company to fill the internet with fake content, using among other things the photograph of a Ukrainian government minister as his own, to obscure his past. Kaweske also did not inform Plaintiffs that companies he said would be part of Clover Top were already formed in his own name and for his own benefit. In fact, during the investment-solicitation period, he continued secretly forming and using companies for his own benefit that were represented as Clover Top's.

And although he said the money would be invested in legal cannabis operations, he did not wait for "Federal and state laws [to] quickly change" before expanding the scope of Clover Top's cannabis business. Instead, he soon began operating Clover Top and Clover Top subsidiaries in a manner that violated provisions of the Controlled Substances Act.

Because Kaweske was a Clover Top officer and director and its CFO with information, power, and inside knowledge; he owed the company and its shareholders fiduciary duties. Despite this, Kaweske created or usurped control over no fewer than 10 entities belonging to or intended for Clover Top or otherwise occupying the same space that Kaweske pledged to Clover Top and its shareholders. These entities took away the assets belonging to Clover Top, used them as their own, and interfered directly with Plaintiffs' financial interests. The assets taken included real estate, licenses, equipment, leases, trademark rights, inventory, and cash held through Sunlife AG, LLC; MMJ 95, LLC; Tweedleaf LLC (a Colorado entity); AJC Industries LLC; Lifestream Holdings LLC; Ordway Farms LLC; JW Colorado LLC; JW Ordway, LLC; and JW Trinidad, LLC – identified in the complaint as the "Kaweske Entities" because Kaweske owns and controls all of them – and Durango Management, LLC, a Clover Top subsidiary that

4

Kaweske now claims to control as well. (The movants are collectively referred to herein as the "Defendants.") In short, the Defendants, in tandem with defendants Welby Evangelista and his companies, stole all Clover Top's assets and corporate opportunities and are running Clover Top's business under other business names. This of course gutted Clover Top and rendered Plaintiffs' investments worthless. (¶¶ 13–28, 34, 52–140.)

As he built his competing empire using Clover Top assets, Kaweske withheld information from Plaintiffs, stalled, lied, failed to perform corporate functions, and let the corporation lapse. He then told at least one of the Plaintiffs that his investment was "no longer relevant" and that "you don't own anything." (¶¶ 122–140.)

John Kaweske – the "J" in the "JW" names among the Kaweske Entities – was aided in his endeavors by Welby Evangelista – the "W" in "JW." Evangelista managed Clover Top with Kaweske and had intimate knowledge of its inner workings, its shareholders, and their investments. Yet he and Kaweske formed a separate entity, North Star Holdings, Inc., that, along with the Kaweske Entities, runs the Clover Top empire under other names. They use the TweedLeaf name, brand, and trademark registrations as their own. They use the real estate, equipment, and leases that Clover Top purchased and paid for. Notably, North Star along with other Kaweske entities sought releases when Plaintiffs came demanding recompense for their losses. *The collective business enterprise of Kaweske, Evangelista, the Kaweske Entities, and North Star is the very business in which the plaintiffs invested.* (¶¶ 85–140.)

On these facts, the plaintiffs – which include Clover Top itself derivatively – have stated valid and highly plausible claims for relief. They seek declaratory and injunctive relief as to their rights and an accounting from all defendants. They have claims against Kaweske under federal

and state securities statutes and common law claims sounding in fiduciary duty, fraudulent misrepresentation and nondisclosure, negligent misrepresentation, and corporate waste. They have claims against the Defendants for conversion, civil theft, fraudulent transfer, civil conspiracy, interference with contract, aiding and abetting breach of fiduciary duty, unjust enrichment (with a request for a constructive trust), and RICO violations. (¶¶ 144–326.)

The complaint is in plain language, with factual allegations and claim elements pleaded straightforwardly with an eye toward the governing *Twombly*/*Iqbal* standard under Rule 8. The causes of action incorporate specific paragraphs in support, as provided by Rule 10. The complaint plausibly alleges that the Defendants stole what was not rightfully theirs and have caused significant harm to Plaintiffs and Clover Top in the process. The plaintiffs rightly seek the aid of this Court in recovering on their substantial claims.

## ARGUMENT

The *Twombly*/*Ashcroft* standard governs here. It is a "plausibility standard" that "is not akin to a probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It "does not require 'detailed factual allegations.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Rather, "a plaintiff's complaint must allege sufficient facts 'to state a claim to relief that is plausible on its face.'" *Strauss v. Angie's List, Inc.*, 951 F.3d 1263, 1266 (10th Cir. 2020) (quoting *Twombly*, 550 U.S. at 570 (2007)). When the court assesses the adequacy of a complaint in response to a rule 12(b)(6) motion, the court's function "'is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's . . . complaint alone is legally sufficient to state a claim for which relief may be granted.'" *Id.* at 1267 (quoting *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (quotation and citation omitted)). To do

that, the Court "accept[s] all well-pled factual allegations as true and view[s] these allegations in the light most favorable to the nonmoving party.'" *Id.* (quoting *Peterson*, 594 F.3d at 727).

The Defendants have raised three grounds for dismissal in their Rule 12(b)(6) motion to dismiss. First, they raise the affirmative defense of illegality. Second, they argue that Plaintiffs' RICO claims should be dismissed for a variety of reasons. And third, Kaweske seeks dismissal of the contract claim against him. The Court should reject the Defendants' arguments.

## I.   The Court Should Reject the Defendants' Illegality Argument

The Defendants argue first that Plaintiffs' claims are "barred because marijuana is illegal under federal law." (Mot. at 3.) Illegality is an affirmative defense that cannot succeed under Rule 12(b)(6) unless the illegality "appears plainly on the face of the complaint itself." *Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965). To appear plainly on the face of the complaint, the complaint must "admit[] all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018); *see also id.* (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff . . . admits all the ingredients of an *impenetrable* defense [] may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).") (emphasis added)). Far from alleging an intent to enter into an illegal contract, the complaint alleges that the Plaintiffs, as passive investors, entrusted their investment funds with the Defendants for the purpose of operating a legal cannabis business. (¶ 137.) The Defendants violated that trust by using the funds to operate the business illegally.[4]

---

[4] It is also important to note that the "contracts" at issue in this case are either Plaintiffs' investment contracts with Clover Top, an entity that has defaulted and thus does not oppose Plaintiffs' claims, or Plaintiffs' oral agreement with Kaweske that Clover Top would be operated

Under these alleged facts there are four reasons why the Court should reject the Defendants' illegality argument. First, the executive and legislative branches of the Federal Government no longer treat marijuana as illegal.

Second, the illegality defense is a defense grounded in public policy and the application of the defense under the facts of this case would harm the public good by shielding the Defendants' illegal and fraudulent conduct from the law in a manner that is inconsistent with federal marijuana policy. *See Bild v. Konig*, 2014 WL 3015236, at *8 (E.D.N.Y. July 3, 2014) (explaining that it is "clear that the defense of illegality is disfavored where a 'defaulting party seeks to raise illegality as a sword for personal gain rather than a shield for the public good'").

Third, it is possible to award relief to Plaintiffs without violating federal law. At the outset it should be noted that Plaintiffs have not alleged the existence of an illegal contract. Rather, Plaintiffs have alleged that they acted as passive investors into what they believed and intended to be a legal cannabis business—based on Defendants' express assertions that the business would be legal—and that the Defendants acted contrary to Plaintiffs' contractual and common-law rights in absconding with that investment and using it for illegal means. With this in mind, the Court can vindicate Plaintiffs' interests in their investment without contravening federal law by enjoining Defendants from continuing their illegal activity. In this way, any profits Plaintiffs derive from their investment will stem from legal activity.

---

legally. For this reason, the majority of Plaintiffs' claims against the current Defendants are not based on a contract, illegal or otherwise. Instead, they are based on statutory or common-law rights and the Defendants' fraudulent and illegal conduct. For this independent reason, the illegality defense, which is grounded in contract law, does not apply to most of Plaintiffs' claims, if any at all. *See, e.g., Tracy v. USAA Cas. Ins. Co.*, 2012 WL 928186 at *3 (D. Haw. Mar. 16, 2012) (addressing "Plaintiff's extra-contractual claims" separately from the contract claims affected by the illegality defense).

In the alternative, even if the Court declines to order Defendants to cease their admitted violations of the Controlled Substances Act, the Court should nevertheless reject Defendants' illegality argument because the Court is capable of awarding Plaintiffs some of their requested relief without requiring any party to engage in illegal conduct. The Court could do this under the Plaintiffs' non-contract claims (which are based, in part, on Defendants' fraudulent inducement to invest and Defendants' misrepresentations regarding the legality of their marijuana business), especially the claims based in federal and state statutes. Under these claims, the Court could award Plaintiffs the return of their initial investment as well as an award of statutory damages. Because the statutory damages would not need to be tied to investment profits and would not need to be tied to any particular asset held by Defendants, the Court could order this relief without requiring any party to violate federal law.

Finally, the Court should reject the Defendants' argument that recission damages and an equitable accounting are barred by the doctrine of illegality because it is possible for the Court to award these requested remedies in a way that does not require any party to engage in illegal conduct.

## A. The federal government's actions have rendered the relevant portions of the CSA dead letter law in states that have legalized marijuana use

In 2005, the United States Supreme Court held that Congress's power to regulate interstate commerce authorized it to "prohibit the local cultivation and use of marijuana." *Gonzales v. Raich*, 545 U.S. 1, 5 (2005). The reason, the Court explained, was that Congress had "enacted comprehensive legislation to regulate the interstate market in a fungible commodity" and that "exemption[s]" for local use could undermine this "comprehensive" regime. *Id.*, at 22-29. But, as Justice Clarence Thomas recently explained, "[w]hatever the merits of *Raich* when it

was decided, federal policies of the past 16 years have greatly undermined its reasoning. Once comprehensive, the Federal Government's current approach is a half-in, half-out regime that simultaneously tolerates and forbids local use of marijuana." *Standing Akimbo, LLC v. United States*, 594 U.S. --- (2021) (Thomas, J., Statement).

After so stating, Justice Thomas identified key instances where the Executive and Legislative branches of the Federal Government have begun treating marijuana as a legal substance. *Id.* For example, in "2009 and 2013, the Department of Justice issued memoranda outlining a policy against intruding on state legalization schemes or prosecuting certain individuals who comply with state law." *Id.* And in "2009, Congress enabled Washington D.C.'s government to decriminalize medical marijuana under local ordinance." *Id.* And, more importantly, "in every fiscal year since 2015, Congress has prohibited the Department of Justice from 'spending funds to prevent states' implementation of their own medical marijuana laws.'" *Id.* (quoting *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016)]. So, by Congressional fiat, the Executive Branch is prohibited from enforcing the marijuana provisions of the CSA in states that have legalized its use. The actions of the Federal Government in the sixteen years since *Raich* was decided have rendered the relevant provisions of the CSA in this case dead letter law. *See Dead Letter*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A law or practice that, although not formally abolished, is no longer used, observed, or enforced.").

This is clear when the Court considers the entirety of the CSA together with the other actions of the Federal Government. *See, e.g., Riverside Press, Inc. v. N. L. R. B.*, 415 F.2d 281, 284 (5th Cir. 1969) (holding that a federal law had become "dead letter law" in some contexts through the passage of subsequent laws). Under the CSA, "the authority to enforce [the CSA

provisions that criminalize the possession and distribution of marijuana] rests only with the United States Attorney General and the Department of Justice." *Crimson Galeria Ltd. P'ship v. Healthy Pharms, Inc.*, 337 F. Supp. 3d 20, 33 (D. Mass. 2018) (internal quotation marks omitted). Yet since 2015, Congress has specifically proscribed the Attorney General and the Department of Justice from enforcing the marijuana-provision of the CSA in states that have legalized marijuana's use. *See Mann v. Gullickson*, 2016 WL 6473215, at *9 (N.D. Cal. Nov. 2, 2016) ("[T]he federal government is currently proscribed from enforcing the CSA in [states that have legalized marijuana use]."). In other words, although the federal proscription of marijuana is still technically a part of the CSA, Congress has expressly stated that it cannot be enforced in states that have legalized marijuana's use. That is the very definition of dead letter law. This Court should not disregard this clear legislative directive by resurrecting what is a dead letter in Colorado. Accordingly, the Court should reject the Defendants' illegality argument.

### B.   Upholding an illegality defense in the defendants' favor would be inconsistent with public policy

If the Court declines to consider the marijuana provisions of the CSA dead letter law in Colorado, the Court should nevertheless reject Defendants' illegality defense because it is an equitable defense inextricably tied to considerations of public policy and its application in this case would be inconsistent with clear public policy.

As the bankruptcy court in *In re Malul* noted, the illegality defense stems from the "bedrock principle of contract law" that "contracts in contravention of public policy are void and unenforceable." 614 B.R. 699, 706 (Bankr. D. Colo. 2020). In support of this assertion, the court in *Malul* cited a number of federal and state Colorado contract cases in which a party argued that a contract or contract provision was void as a matter of public policy. *See, e.g, id.* (citing *Mason*

*v. Orthodontic Centers of Colorado, Inc.*, 516 F. Supp. 2d 1205, 1212 (D. Colo. 2007) ("It is a long-standing axiom of contract law that a contractual provision is void if the interest in enforcing the provision is clearly outweighed by a contrary public policy"). So the illegality defense applies only where the contract contravenes public policy.

In *Mason v. Orthodontic Centers of Colorado, Inc* —a case the *Malul* court cited in support of its illegality analysis—the court explained that there are two instances in which a contract provision can be found void as a matter of public policy. First, a contract provision may be treated as void where the legislature has "expressly stated that contracts contravening particular legislative enactments are deemed void." *Id.* (citing C.R.S. § 38–12–103(7) (voiding contractual waivers of rights under Security Deposits Act)). This demonstrates that in the absence of such an express legislative statement, a contract provision that violates a statute is not automatically void. *See also Energy Labs, Inc. v. Edwards Eng'g, Inc.*, 2015 WL 3504974, at *3 (N.D. Ill. June 2, 2015) ("Notwithstanding, the Seventh Circuit has explained that even if a contract is illegal, it is not automatically unenforceable.").

And second, a contract provision may be treated as void where a court determines that "the interest in [the contract's] enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." *Id.* In weighing the general policy of contract enforcement with a competing public policy, courts "must weigh the legitimate interests of the parties against the weight of the policy and its connection with the parties' conduct." *Id.*; *Bassidji v. Goe*, 413 F.3d 928, 937–38 (9th Cir. 2005) ("Nuanced approaches to the illegal contract defense, taking into account such considerations as the avoidance of windfalls or forfeitures, deterrence of illegal conduct, and relative moral culpability, remain viable in federal

court . . . ."). So the defense of illegality is rooted in public policy concerns and should be applied here only after the Court considers, in light of all the facts in the case, competing public policy in favor of enforcing contractual obligations against another identified public policy.

This is true even when courts consider the enforceability of contracts related to the illegal use of marijuana. As the Court explained in *In re Malul*—a case involving a contract related to the illegal use of marijuana—"federal courts do not take a 'black-and-white' approach to unenforceability for illegality." This is because the defense is rooted in public policy considerations—an analysis that defies a bright-line approach. And in considering the role of public policy, the Tenth Circuit has stated that the defense of illegality "does not exist for the benefit of the party seeking to avoid contractual obligations, but instead serves to protect the public from contracts that are detrimental to the public good." *McCracken v. Progressive Direct Ins. Co.*, 896 F.3d 1166, 1172 (10th Cir. 2018). This is consistent with the approach of other courts, which have held "that the defense of illegality is disfavored where a 'defaulting party seeks to raise illegality as a sword for personal gain rather than a shield for the public good." *Bild v. Konig*, 2014 WL 3015236, at *8 (E.D.N.Y. July 3, 2014); *see e.g.*, *Asdourian v. Araj*, 696 P.2d 95, 105 (Cal. 1985) ("In compelling cases, illegal contracts will be enforced in order to avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff. In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." (citations omitted) (internal quotation marks omitted)).

In this case, public policy weighs against the Defendants' illegality defense. The Defendants have not identified any express legislative statement providing for the invalidity of

contractual provisions that are contrary to the CSA. So Plaintiffs' investment agreement would not be automatically void. Consequently, the Court "must weigh the legitimate interests of the parties against the weight of the policy and its connection with the parties' conduct." *Mason*, 516 F. Supp. 2d at 1213. This test strongly weighs against the Defendants.

First, as discussed at length in subsection A, the actions of Congress and the Executive branch during the sixteen years since the Supreme Court decided *Raich* have demonstrated that the Federal Government no longer considers marijuana illegal in states that have legalized its use and, therefore, marijuana businesses in these states do not contravene public policy. *See Mann*, 2016 WL 6473215, at *9 ("[T]he federal government is currently proscribed from enforcing the CSA in [states that have legalized marijuana use].") The Court should not disregard these policy directives. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978) (It is "emphatically . . . the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for . . . the courts to enforce them when enforcement is sought."); *see also United States v. Oakland Cannabis Buyers' Co–op.*, 532 U.S. 483, 497 (2001) (A "court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'").

Second, Plaintiffs have a legitimate interest in receiving the benefit of their agreements to invest money with the Defendants. As Plaintiffs discuss in greater detail below, their intent was to act as a passive investor in a legal cannabis business—something that was certainly possible under federal law. In making these investments, Plaintiffs relied on Defendants' representations

that the business would be legal.[5] (¶¶ 37–45) And they trusted that Kaweske, an individual with "special knowledge about the industry," would use the invested funds in a manner consistent with that representation. (¶¶ 38, 45, 159).

In alleging their intent to invest in a legal cannabis business, Plaintiffs are not suggesting that they had a thorough understanding of which cannabis-related activities were permitted under federal law and which were not. Plaintiffs do not allege that they are lawyers. Rather, they allege only that they intended to invest in a legal business, and they trusted that the Defendants and the Tannenbaum Defendants (the law firm Kaweske employed) would ensure that their investments funded legal cannabis-related operations, which would expand as the laws across the country changed. Furthermore, Defendants represented to Plaintiffs that the *legal* cannabis industry was already a $4.57 billion industry nationwide and that from 2014 to 2020 this would grow to be a $17.23 billion industry. And, as is discussed in greater detail below (in subsection C), under federal law there are multiple ways in which the Defendants could have operated a legal

---

[5] The Third Amended Complaint includes additional details about the representations Defendants made regarding Clover Top's legality. They told Plaintiffs that the business would be "on the up and up" (¶ 37), they emphasized in their solicitations that they already had multiple business licenses and trademarks (including federal trademarks) and that the business was already operating openly (¶¶ 37, 42, 43), and they stated through their written materials that Clover Top was a corporation established "in the burgeoning legal cannabis industry," that Clover Top intended to establish a "national brand," that Clover Top owned a "registered trademark . . . for both retail and online sales of medicinal botanicals and nutraceuticals nationwide," that they were already selling "proprietary hemp-based cannabidiol (CBD) products, . . . that [were] currently legal to sell nationwide," that "as of 2014, the legal aspects of the national cannabis market constituted a $4.57 billion industry," that "the 'U.S. Legal Marijuana Markets' would grow to $17.23 billion from 2014 to 2020," that "[t]he legal cannabis industry is the fastest-growing segment of the United States economy," that " its '[h]emp-derived CBD products can be legally purchased both in-store and online nationwide,'" that they intended to establish a premier "medical cannabis brand—initially in Colorado and then nationwide," that Clover Top would "disrupt the stigma of illicitness associated with cannabis," and that Clover Top was "prepared for future nationwide expansion as Federal and state laws quickly change." (¶ 45.)

cannabis business. With these facts in mind, Plaintiffs' expectation that Clover Top would be a legal business was not unfounded. *See Standing Akimbo*, 594 U.S. --- (Thomas, J., Statement) ("Given all these developments, one can certainly understand why an ordinary person might think that the Federal Government has retreated from its once-absolute ban on marijuana . . . One can also perhaps understand why business owners in Colorado, like petitioners, may think that their intrastate marijuana operations will be treated like any other enterprise that is legal under state law."). Public policy strongly favors enforcing the parties' contract obligations.

Additionally, the Defendants do not have a legitimate interest in seeking to avoid obligations under the contract with Plaintiffs. The Defendants are not seeking to have the contract voided so that they can avoid engaging in illegal conduct, as is typical in most illegal contract cases. *See, e.g.*, *Hemphill v. Liberty Mut. Ins. Co.*, 2013 WL 12123984 (D. N.M. Mar. 28, 2013) (insurer raised defense to avoid funding illegal marijuana operation). Rather, the Defendants are audaciously asking the Court to deem any contracts with Plaintiffs void so they can continue their illegal conduct unhindered. Thus they seek to "raise illegality as a sword for personal gain." That is not the purpose of the illegality defense. *McCracken*, 896 F.3d at 1172 (noting illegality defense "does not exist for the benefit of the party seeking to avoid contractual obligations"); *Green Earth Wellness Ctr., LLC v. Atain Specialty Ins. Co.*, 163 F. Supp. 3d 821, 833 (D. Colo. 2016) (rejecting an insurance company's illegality defense where the contracting parties shared "a mutual intention that the Policy would insure [the plaintiff's] marijuana").

What's more, under the facts alleged, the Defendants have violated federal securities laws. (¶¶ 155–165.) The Securities Exchange Act prohibits individuals from using any devices to defraud, making any untrue statements of material facts, or engaging in any act which would

16

operate as fraud or deceit upon any person in connection with the purchase or sale of securities. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. Plaintiffs have alleged that the Defendants violated this law by making material misstatements, in part, about the legality of Clover Top's business in order to convince Plaintiffs to invest in Clover Top. *See Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 (1971) (recognizing a private cause of action for violations of 15 U.S.C. § 78j); *See* RESTATEMENT (SECOND) OF TORTS § 545 (1977) (setting forth the situations in which individuals may justifiably rely on misrepresentations of law). Because these allegations, once proven, amount to a violation of federal law, the Defendants are essentially requesting the Court to excuse their illegal conduct under the Securities Exchange Act because they are also engaging in illegal conduct under the CSA. But two wrongs do not make a right, so the Defendants should not be allowed to use the illegality defense in this way.

In fact, the Defendants have not cited a single case, and Plaintiffs have not found one, in which a court upheld the illegality defense on facts similar to the facts in this case—in favor of someone who is both attempting to avoid a contractual obligation while continuing to engage in the illegal activity underlying the illegality defense and against a plaintiff who did not intend to engage in any illegal conduct. For example, in *In re Malul*, 614 B.R. at 706; *In re Johnson*, 532 B.R. 53, 56 (Bankr. W.D. Mich. 2015); and *In re Arenas*, 535 B.R. 845 (Bankr. 10th Cir. 2015), bankruptcy courts upheld the illegality defense. But in each of those cases, the illegality defense was raised by a bankruptcy trustee who was obviously not a party to the illegal contract or illegal activity at issue. So there is a substantial distinction between the party raising the illegality defense in those cases and the Defendants in this case.

The Defendants are also distinguishable from the defendants in *Hemphill v. Liberty Mut. Ins. Co.*, 2013 WL 12123984 (D. N.M. Mar. 28, 2013); *Tracy v. USAA Cas. Ins. Co.*, 2012 WL 928186 (D. Haw. Mar. 16, 2012); *Bassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005); *River N. Properties v. City and County of Denver*, 2014 WL 7437048 (D. Colo. Dec. 30, 2014); and *Fourth Corner Credit Union v. Fed. Res. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017).[6] In those cases, the defendants invoked the illegality defense to *avoid* engaging in illegal conduct.

In *Hemphill* and *Tracy*, the defendants were insurance companies who invoked the illegality defense so that they would not be compelled, based on the obligations in the insurance contract, to fund an illegal marijuana operation. In *Bassidji*, the defendant was a contract party who was attempting to avoid investing funds in an Iranian company in violation of an executive order. In *River North Properties*, the defendants, the City and County of Denver, raised the defense to avoid granting a building permit for a marijuana-growing facility in violation of federal law. And in *Fourth Corner Credit Union*, the defendant branch of the federal reserve raised the defense to avoid granting a "master account" that would be used to facilitate the operation of illegal marijuana businesses. So in each of these cases, the defense was raised, and upheld, in favor of a defendant who was using the defense to avoid being compelled to engage in the illegal activity. Not so in this case.

---

[6] The decisions in *Polk v. Gontmakher* and *Bart Street III v. ACC Enterprises, LLC* are also distinguishable because in those cases the plaintiffs had intended to fund or invest in an illegal marijuana business. In fact, in *Polk* the plaintiff actively assisted in growing and distributing marijuana. And in *Bart St. III.*, the plaintiff intentionally loaned money to an illegal marijuana business. Notwithstanding the plaintiff's undisputed intent to fund a business primarily dedicated to violating federal law, the court nevertheless refrained from voiding the contract so long as the plaintiff could prove that its funds did not directly fund an illegal aspect of the business. This case is distinguishable from both cases because Plaintiffs intended to invest in a *legal* business.

In this case, the Defendants invoke the defense so that they can continue the illegal conduct forming the basis of their defense and they invoke it against plaintiffs who intended to invest in a legal business and seek a judicial remedy consistent with federal law. (¶ 5; Prayer for Relief (requesting whatever equitable relief may be necessary, including an injunction, to provide Plaintiffs the benefit of its legal investment).) The application of the defense to these facts would be inconsistent with public policy.

Plaintiffs also note that, in a previous motion, the Defendants argued that granting Plaintiffs the relief they seek would "endorse" Plaintiffs' illegal activity.[7] But Plaintiffs have not engaged or intended to engage in illegal activity; the Defendants have. And granting Plaintiffs' requested relief would do the opposite of what the Defendants suggest. Plaintiffs intended to invest in a legal cannabis business, so to shield Defendants from Plaintiffs' claims based on Defendants' unilateral decision to engage in illegal conduct would endorse not only Defendants' allegedly illegal conduct under the CSA but also their securities violations.

In sum, a contract provision may be voided if the legislature has expressly provided that contracts in violation of a specific statutory provision shall be deemed void. In the absence of an express legislative enactment, contracts in violation of law are not automatically void. Instead, a

---

[7] The Defendants specifically cite 21 U.S.C. §§ 853, 881 in support of their argument. But neither provision establishes a violation of the Act. Rather, they provide the Attorney General with authority to confiscate property of "[a]ny person *convicted of a violation*" under the Act. But Plaintiffs have not alleged a conviction under any provision of the Act. And courts have made clear that although "the CSA provisions that criminalize the possession and distribution of marijuana . . . may be enforced criminally, civilly, or administratively," "*the authority to enforce th[ose] provisions rests only with the United States Attorney General and the Department of Justice*." *Crimson Galeria Ltd. P'ship v. Healthy Pharms, Inc.*, 337 F. Supp. 3d 20, 33 (D. Mass. 2018) (emphasis added) (internal quotation marks omitted). Thus the application of the forfeiture provisions cited by the Defendants is not plain on the face of the complaint, thus those provisions do not apply.

court may deem a contract provision void if the public interest in the contract's enforcement is *clearly outweighed* in the circumstances by a public policy against the enforcement of such terms. And in making this determination, courts must weigh the legitimate interests of the parties against the weight of the policy and its connection with the parties' conduct. In this case, all these factors weigh strongly in Plaintiffs' favor. Plaintiffs intended to invest in a legal business. In contrast, Defendants openly aver that they have intentionally violated multiple federal laws and now seek to use those violations as a shield against Plaintiffs' legitimate claims. For these reasons, the Court should reject the Defendants' illegality defense and deny their motion.

> **C. Alternatively, the Court should deny Defendants' motion even if it concludes the illegality defense should apply because it can award relief without requiring illegal conduct.**

Third, and alternatively, even if the Court concludes that the illegality defense should apply in this case, the Court should still deny the Defendants' motion because the Court can award the relief Plaintiffs seek without requiring illegal conduct. Plaintiffs acknowledge that in the past some courts have declined to "order a party to a contract to perform an act that is in direct violation of a positive law directive," even where public policy is strongly in favor of a contract's enforcement. *Bassidji v. Goe*, 413 F.3d 928, 936 (9th 2005); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 79-80 (1982) (distinguishing cases in which the courts are asked *to order an illegal act* from cases in which the relief sought does not seek directly to order illegal activity). But even if the Court concludes that some of the relief requested in Plaintiffs' complaint or the parties' investment agreements would require the Court to order Plaintiffs or any of the defendants to perform an illegal act (such as providing Plaintiffs with the full benefit

of their investment contract under a breach of contract theory), the Court could nevertheless structure the judgment in a way that awards Plaintiffs relief without requiring illegal conduct.

Plaintiffs are not seeking enforcement of a contract to engage in illegal conduct. They are seeking the benefit of their investment in what they expected to be a legal business. For this reason, Plaintiffs' investment agreements were not the type of "intrinsically illegal" agreements that courts decline to enforce under the illegality defense. *See In re Malul*, 614 B.R. 699, 708 (Bankr. D. Colo. 2020) (explaining that at the motion to dismiss stage a complaint should not be dismissed based on illegality unless the contract at issue was "intrinsically illegal").

Under federal law there are numerous ways in which an individual could operate a profitable and legal cannabis business. This is because federal law does not prohibit the use of cannabis, it prohibits the use of "marihuana." And federal law specifically defines "marihuana" to expressly exclude some forms of the Cannabis sativa L. plant and its derivatives. So the illegality of a cannabis plant depends upon a level of technical precision not found in the complaint. *See* 21 U.S.C. § 802(16)(A) (defining "marihuana").

And the Controlled Substances Act ("CSA" or "Act") acknowledges that even substances specifically identified as controlled substances under the Act "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people." 21 U.S.C. § 801. For this reason, the Act provides a mechanism whereby businesses can receive approval to "manufacture[] or distribute[] any controlled substance" governed by the Act. 21 U.S.C. § 822; *see also* 21 U.S.C. § 823; *Gonzales v. Raich*, 545 U.S. 1, 14 (2005) (noting the existence of an "exception" for marijuana under the Act when it is being used as a "drug as part of a Food and Drug Administration preapproved research study"). Also, Plaintiffs note that,

to date, the Food and Drug Administration has approved one cannabis-derived and three cannabis-related drug products.[8] So, under federal law, even a controlled substance like marijuana could conceivably be used in a commercial enterprise. Some companies have already received federal approval to make a profit selling cannabis-derived pharmaceuticals, and other companies, including companies owned by Defendants, are in the process of securing approvals.[9]

Under this regulatory framework there are many ways in which a cannabis business could be profitable while obeying all state and federal laws. An example of a legal "cannabis" businesses would be a business selling hemp and hemp products. *Id.* § 802(16)(B) (defining exclusions including hemp and other portions of the plant); 7 U.S.C. § 1639o(1) (expressly excluding statutorily-defined hemp).[10] Two other examples of potential legal cannabis businesses would be a business selling CBD oil or a pharmaceutical business developing, with federal

---

[8] See FDA Regulation of Cannabis and Cannabis-Derived Products, Including Cannabidiol (CBD); accessed at https://www.fda.gov/news-events/public-health-focus/fda-regulation-cannabis-and-cannabis-derived-products-including-cannabidiol-cbd. The Court may take judicial notice of these FDA approvals on a 12(b)(6) motion to dismiss because it is a matter of public record that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see also Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment."); *Hastey v. Welch*, 449 F. Supp. 3d 1053, 1060 (D. Kan. 2020) (taking judicial notice, at the motion to dismiss stage, of information found on a company website).

[9] *See* https://www.prnewswire.com/news-releases/north-star-holdings-inc-north-star-submits-seven-research-license-applications-with-the-dea-for-cannabis-cultivation-301219445.html ("North Star via its affiliates has submitted seven applications for cultivation of research cannabis with the U.S. Drug Enforcement Agency (DEA) to offer pharmaceutical grade cannabis grown in multiple locations.").

[10] Read together, these provisions establish that the plant Cannabis sativa L. can constitute either legal hemp or illegal marihuana depending on a particular plant's delta-9 tetrahydrocannabinol concentration. Because the complaint does not establish any concentration levels, any conclusion of illegality necessarily depends on facts extrinsic to the complaint or on improper inferences.

approval, pharmaceuticals derived from the cannabis plant. So, under federal law, there are many legal ways in which a company like Clover Top could make a profit in the cannabis industry. Thus, when the factual allegations in the complaint are considered in their entirety, the Court should not assume that every aspect of Clover Top's business is illegal under federal law.

In the complaint, Plaintiffs allege that Defendants made several representations to Plaintiffs regarding the profitability of a legal cannabis business. These representations include stating that Clover Top was a corporation established "in the burgeoning legal cannabis industry," that Clover Top was already selling "proprietary hemp-based cannabidiol (CBD) products, . . . that [were] currently legal to sell nationwide," that "as of 2014, the legal aspects of the national cannabis market constituted a $4.57 billion industry," that "the 'U.S. Legal Marijuana Markets' would grow by $17.23 billion from 2014 to 2020," that "[t]he legal cannabis industry is the fastest-growing segment of the United States economy," that " its '[h]emp-derived CBD products can be legally purchased both in-store and online nationwide,'" and that Clover Top would "disrupt the stigma of illicitness associated with cannabis." (¶ 45.)

With this factual and legal framework in mind, the Court should not assume that the references to cannabis throughout Plaintiffs' complaint are representative of Plaintiffs' intent to invest in a company that engages in federally proscribed uses of the cannabis plant. *Dias v. City and Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (explaining that on a motion to dismiss courts must take the allegations of the complaint as true, and "draw[] all reasonable inferences . . . in the light most favorable to the plaintiffs"); *cf. Earth Science Tech, Inc. v. Impact UA, Inc.*, 809 F. App'x 600, 608 (11th Cir. 2020) ("We will not assume that [defendant] would so flagrantly conduct its operations and advertise them as legal if it believed that distribution was

illegal."). Nor should the Court assume that all aspects of Defendants' business are illegal under federal law. Rather, the Court should read Plaintiffs' allegations regarding intent to invest in a legal cannabis business as an intent to invest in a business allowed under federal and state law and it should assume that at least some aspects of Defendants' cannabis business are legal under federal law.[11]

When the complaint is read in this way, there is no basis to assume that all the Complaint's references to "cannabis" and "marijuana" necessarily fall within the scope of statutory illegality. Nor does anything in the complaint establish any obligation for any party to deal in statutorily defined "marihuana" or otherwise engage in illegal behavior. *Cf. Ginsburg v. ICC Holdings, LLC*, 2017 WL 5467688, at * 7 (N.D. Tex. Nov. 13, 2017) (rejecting Rule 12(b)(6) illegality defense, in part, because nothing in the allegedly illegal contracts created an obligation to engage in illegal behavior).

Instead, the complaint affirmatively establishes that the Defendants expressly represented that their businesses would engage in "legal" activities. (¶¶ 37–45, 158.) The complaint also alleges that Plaintiffs trusted that representation and believed, based on Kaweske's "special knowledge about the industry," that the business would be operated in compliance with all applicable laws. (¶ 158). *See* RESTATEMENT (SECOND) OF TORTS § 545 (1977) (explaining that one may justifiably rely on misrepresentations of law when it is made by someone acting as a

---

[11] In a previous ruling the Court concluded, based on the fact that Plaintiff Morton had visited some of the Clover Top operations before making his second investment, that Morton had not been deceived about the illegal nature of the operation. But Morton and the other plaintiffs lack the expertise to distinguish between the forms of the Cannabis sativa L. plant that are illegal under federal law and those that are legal. Thus their visit to the site would not have necessarily told them anything about the operation's legality. Accordingly, the Court should not disregard the allegations in the complaint regarding what Plaintiffs believed.

fiduciary and who purports to have special knowledge). And it alleges that some aspects of Clover Top's business are legal under federal law. There is no basis at this early stage to disregard these allegations.

Furthermore, Clover Top's publicly filed certificate of incorporation affirmatively limits it to engaging in "legal act[s] and activity." (Ex. 1 hereto.)[12] Likewise, both Delaware and Colorado law – the governing corporate law for Clover Top's operations here, as well as all the Entity Defendants – expressly limit such entities to engaging in "lawful business." 8 Del. C. § 101(b); C.R.S. § 7-80-103. The fiduciaries of those entities are presumed not to have acted below that statutory floor of permissible legal activity. *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del. 2006); *Gagne v. Gagne*, 459 P.3d 686, 694 (Colo. App. 2019). The Defendants thus cannot show on the face of the complaint that Plaintiffs intended to enter into a contract requiring any party to engage in a prohibited business under federal law or that every aspect of their cannabis business is illegal under federal law.[13]

Based on all of the contextual information above, the Court should conclude (1) that Plaintiffs believed they were investing in a legal business; (2) that, on the allegations contained in the complaint, there are significant portions of Defendants' operations that are legal and from

---

[12] The Court may consider this public record in deciding a 12(b)(6) motion. *See Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006).

[13] Additionally, substantive civil law also weighs heavily against any inference of illegality. The Supreme Court has recently reiterated that, "[a]bsent conviction of a crime, one is presumed innocent" in civil as well as criminal actions. *Nelson v. Colorado*, 137 S. Ct. 1249, 1252 (2017); *see also id.* at 1255 n.8 (same). The complaint records no criminal convictions. The Defendants' unsupported assertions of illegality lack any basis to overcome that bedrock presumption. For this same reason, the forfeiture provisions in the CSA, upon which the Defendants rely, do not apply in this case. *See infra* n.7.

which relief could be awarded; and (3) Defendants are invoking the illegality defense so that they can continue their illegal conduct instead of to avoid illegal conduct. With these three points in mind, this case is distinguishable from any case in which a court has upheld the illegality defense.

Having so concluded, the Court may appropriately follow the approach in employed in *Bart St. III*. In *Bart St. III*, the court explained that a plaintiff-creditor's contract claim was not barred by the illegality defense so long as the plaintiff intended only to make a loan (without intending to acquire an ownership interest in an illegal enterprise). *See Bart St. III*, 2020 WL 1638329 at *6. This was true although the plaintiff provided the loan "to finance the expansion of Defendants' marijuana cultivation business," *see id.* at *1, because, according to the court, loans made to "repay existing debts and purchase land are lawful." *Id.* at *5.[14] So it is in this case. It is lawful to invest in a legal cannabis business. Because Plaintiffs intended to invest in a legal business, the Court may require the Defendants to repay Plaintiffs what they are owed under the investment agreements, so long as the Court does not require a party to engage in illegal conduct as part of the award. The Court could accomplish this in at least two ways.

> **1.  *The Court may award declaratory, injunctive, and other equitable relief.***

In their complaint, Plaintiffs requests multiple forms of declaratory, injunctive, and other equitable relief that are not directly dependent on the future revenues of illegal activities. As a specific example, the complaint requests "an accounting of all relevant entities," "recission of Plaintiffs' purchase of shares in Clover Top and return of its investment, with interest and any

---

[14] That approach is appropriate in illegality cases due to the "fungibility of currency," which allows the Court to award monetary damages without endorsing or requiring illegal activity. *Malul*, 614 B.R. at 708 (citing *Ginsburg*, 2017 WL 5467688, at *8).

appropriate other relief provided by law or equity," and "such other relief as the Court deems just and equitable." (Prayer for Relief.) None of these forms of relief would require either party to engage in an act specifically in violation of federal law. For instance, by allowing the case to proceed to the discovery stage and allowing for an accounting so that the Court and Plaintiffs can determine whether any of the Defendants' assets are untainted from the aspects of cannabis that are illegal under federal law, the Court would not be ordering them to perform an illegal act because the act of accounting is not illegal. And in this way the Court would have a clearer view from which to apply the defense of illegality, if at all.

Additionally, Plaintiffs have asked the Court to provide "[e]quitable relief based on the facts . . . including declaratory, injunctive, and other such relief as may be required." (¶ 5, prayer for relief.) Plaintiffs contemplate that in order to award relief it may be necessary for the Court to enjoin the Defendants from operating their cannabis businesses in violation of federal law. By so ordering, the Court will ensure that any form of relief it grants, such as a right of future profits, will not require either party to perform an illegal act.

This is similar to what the United States Bankruptcy Court for the Western District of Michigan did in *In re Johnson*, 532 B.R. 53 (Bankr. W.D. Mich. 2015). In that case, the bankruptcy trustee requested that a debtor's bankruptcy case be dismissed because, according to the trustee, "the debtor appear[ed] to be engaged in the marijuana industry" and so the protections of the Bankruptcy Code would, as a practical matter, "aid" the debtor's violations of the CSA. The court agreed that under the facts of that case the debtor's involvement in the marijuana industry would "invariably taint the court and the Standing Trustee." *Id.* at *56. But even though the court concluded that the debtor's business was "patently incompatible with a

bankruptcy proceeding," the court reasoned that dismissal was not necessarily required. *Id.* at *57. Instead, the court concluded that a "preferable" approach under the circumstances would be to "require [the debtor] to discontinue growing, selling, and transferring marijuana" in violation of the Act. *Id.* at *58. This would also be a preferable approach in this case.

In its previous ruling, the Court distinguished this case from *In re Johnson* on grounds that the *Johnson* court gave the debtor a choice between ceasing his illegal conduct or having his bankruptcy case dismissed, whereas in this case the defendants engaged in illegal conduct are unwilling to cease their illegal activity. But the Court does not need Defendants' permission to enjoin the Defendants' illegal activity. *See Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 902 (10th Cir. 2017) (discussing federal courts "equitable powers" over parties under Article III).

The Court also stated that a plaintiff could not enjoin Defendants' illegal activities because "a private citizen" cannot "seek injunctive relief to enforce the CSA." Decision at 20. In support of this assertion, the Court cited the Tenth Circuit's decision in *Hickenlooper*. But the discussion in *Hickenlooper* actually supports Plaintiffs' request for an injunction. In that case, plaintiffs sought an injunction for violations of the CSA. *Hickenlooper*, 859 F.3d at 877. The court rejected this argument because the plaintiffs did not claim "any federal substantive rights" that had been injured by the action and the CSA did not provide them any. *Id.* But in so doing, the court explained that "[o]nce a right and a violation have been shown, the scope of a [federal] court's equitable powers to remedy . . . wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Id.* at 901. When these legal principles are applied to the facts of this

case, the Court may enjoin Defendants' illegal activity based on the Defendants' violations of other, non-CSA rights held by the Plaintiffs.[15]

In their complaint Plaintiffs allege a violation of their substantive rights under the Securities and Exchange Act, RICO, the Colorado and Utah securities acts, and a handful of other common-law rights. And they ask for relief based on the violations of these substantive rights. Importantly, in contrast to the plaintiffs in *Hickenlooper*, nowhere in their complaint do Plaintiffs request relief based on a violation of the CSA. Instead, it is Defendants who are attempting to invoke the provisions of the CSA to shield themselves from the Plaintiffs' requested relief (which, again, are based on the violation of Plaintiffs' non-CSA-based rights). To the extent the Court believes the Defendants' ongoing violations of the CSA would prevent the Court from granting this relief, those CSA violations should be enjoined. *Hickenlooper* does not require a different result.

Finally, in its previous ruling the Court stated that Plaintiffs had not pled the elements needed for an injunction. The Third Amended Complaint contains those pleaded elements. *See* ¶¶ 144–154. For example, the Complaint alleges that Defendants' illegal actions are causing Plaintiffs irreparable harm by depriving "Plaintiffs of valuable choses in action and other legally enforceable rights." (¶ 148.) This is so because, by engaging in illegal conduct, the Defendants have barred Plaintiffs—through the illegality defense—from protecting the many legal rights

---

[15] In its previous order, the Court also noted that there is "considerable doubt" whether equitable relief is available to private RICO litigants under any circumstances. But, as is discussed above, Plaintiffs' request for injunctive or other equitable relief is based on claims beyond their RICO claims. Accordingly, the Court has full authority to enjoin Defendants' illegal conduct based on the Defendants' violation of Plaintiffs' statutory and common-law rights.

they seek to vindicate in this lawsuit. Accordingly, the Court may award at least some of the equitable, declaratory, and injunctive relief Plaintiffs request.

### 2. *The Court may award compensatory damages*

The Court may also award compensatory damages. As Plaintiffs have noted throughout, the Defendants attempt to force this case to fit their alleged illegality defense, baldly assuming that *all* businesses touched by plaintiffs' claims are entirely illegal and thus preclude the possibility of relief. Their ill-founded assumptions cannot overcome the complaint's well-pleaded facts establishing multiple avenues by which the court might grant legal remedies—including monetary damages for their various causes of action.

First, after enjoining the Defendants from operating their businesses illegally, the Court could award Plaintiffs their full share of the profits (going forward) derived from the businesses.

Second, even if the Court permits the Defendants' illegal conduct to continue, the Court may nevertheless award Plaintiffs a compensatory-damage award for their breach of contract claims that is to be paid from legal sources. As noted above, any recovery based on cannabis-derived products outside the statutory definition of "marihuana" would not require any CSA violation at all. Besides any such legal cannabis, "CBD," and "hemp-based" products (¶ 40), the defendants' business models clearly contemplate revenue streams independent of any cultivation or sale of illegal marijuana. (¶¶ 40–45.) Additionally, Plaintiffs have alleged that the Defendants purchased and own real estate and other assets, including by using Plaintiffs' investment. (¶¶ 61–63, 66–67, 80, 81, 90–92, 137.) By alleging the existence of the specific assets identified in the complaint, Plaintiffs have demonstrated that there are potential legal sources of assets for a compensation award that are untainted by the Defendants' illegal conduct. Land, buildings,

warehouses, and other property belonging to the defendants can be sold to satisfy a judgment. This is true not only of the companies named in the complaint, but of Kaweske, Evangelista, and other individual defendants. Defendants cannot wish away these alleged facts.

With this in mind, and once the Court allows for discovery or an accounting to better distinguish between the legal and illegal aspects of Defendants' business, the Court can tailor any compensatory-damage award so that it is based solely on legal conduct and assets. For example, as part of Plaintiffs' breach of contract claim, Plaintiffs have requested their share of profits of Defendants' business. (¶ 188.) And elsewhere in their complaint, they have alleged that, according to Defendants, the legal cannabis industry was predicted to grow from a $4.57 billion industry around the time of Plaintiffs' investment to a $17.23 billion industry by 2020. (¶ 45.) So were the Court to decline, based on the illegality defense, to award Plaintiffs their share of their profits for the entire business, the Court could nevertheless award Plaintiffs their share of the profits from the legal portions of the business.

Alternatively, even if the Court were to decline to award Plaintiffs compensatory damages for their contract claims, the Court could nevertheless award Plaintiffs damages for most of their other causes of action without tying the damage award to a specific source.[16] On

---

[16] Plaintiffs note that even if the Court were to conclude that it cannot award any relief based on Plaintiffs' contract claims, it would nevertheless be able to award relief on Plaintiffs' unjust enrichment claims. The two claims are substantially different. The contract claim against Clover Top arose because Clover Top did not perform as promised in its contractual agreements. (¶¶ 183–88.) In contrast, the unjust enrichment claims against the Defendants arose because the Defendants took assets—without a contract—that did not belong to them. (¶¶ 237–40.) So the two claims are based on different facts and are brought against different defendants. For this reason, Plaintiffs' unjust enrichment claim is not barred by the Defendants' illegality contract defense. *See cf. Ginsburg v. ICC Holdings, LLC*, 2017 WL 5467688 at *8 (N.D. Tex. Nov. 13, 2017) (explaining that courts do not allow the illegality "defense to be used to confer windfalls").

this point it is important to note that although a court may grant relief only so long as the relief does not require a violation federal law, this does not mean the Court has an affirmative responsibility (in civil contract cases) to prevent contract parties from engaging in conduct that violates the CSA. That responsibility rests solely with the Executive Branch. *See Crimson Galeria Ltd. P'ship v. Healthy Pharms, Inc.*, 337 F. Supp. 3d 20, 33 (D. Mass. 2018) (explaining that "the authority to enforce [the CSA's] provisions rests only with the United States Attorney General and the Department of Justice" (internal quotation marks omitted)). Rather, in determining whether to allow contract claims to proceed in circumstances such as these, courts need only determine whether the granting of a requested remedy would absolutely require one of the parties to take an action in violation of the law. *See Mann v. Gullickson*, 2016 WL 6473215 at *7 (N.D. Cal. Nov. 2, 2016); *Bassidji v. Goe*, 413 F.3d 928, 939 (9th Cir. 2005).

For example, in *Mann v. Gullickson*, the court managed to craft a remedy that required contract parties to enforce provisions of their contracts related to illegal "marijuana businesses" without expressly ordering either party to violate the law. 2016 WL 6473215 at *7. In that case, the plaintiff had sold "marijuana businesses" to the defendant, who under the contract-of-sale was required to make installment payments to plaintiff. *Id.* at *2. After the defendant failed to make a payment required under the contract, Plaintiff sued for enforcement of the defendant's payment obligations. *Id.* The defendant argued that the contract was unenforceable because the intent of the parties was to have the defendant "make payments promised under the promissory note 'with revenue derived from operating the [illegal] marijuana businesses.'" *Id.*

But the court in *Mann* rejected this argument. According to the court, enforcing the contract would not necessarily require any party to violate the CSA because it was theoretically

possible that the defendant could make the required payments from sources other than the illegal marijuana businesses and because it was also theoretically possible that the defendant could operate the marijuana businesses in a manner that complied with federal law. *Id.* at *7. In other words, because the court was not expressly tying the payment obligations to tainted sources and because it was at least theoretically possible that the defendant could make the payments from an untainted source, the Court rejected the illegality defense. The Court here should do the same.

In this case, many of the causes of actions pleaded by Plaintiffs would allow Plaintiffs to collect not only recission damages (which this Court has already determined are awardable in a previous order) but also a damage award for "interest at the statutory rate from the date of [Plaintiffs'] payment[s], costs, and reasonable attorney fees." *See* C.R.S. § 11-51-604; C.R.S. § 18-4-405; UT Code § 61-1-22. And Plaintiffs have also alleged a number of causes of action that could give rise to statutory awards of exemplary damages, *see* C.R.S. § 13-21-102, or for some multiple of the amount paid for Plaintiffs' shares in Clover Top. *See* C.R.S. § 18-4-405 (treble damages); C.R.S. § 38-8-108 (for "one and one-half the value of the asset transferred"); Utah Code § 61-1-22 (for "three times the consideration paid for the security"). The Court can award relief for these causes of action without implicating the illegality defense.

In a previous order, the Court ruled that it could not award relief for the non-contract claims because the "Court may not vindicate equity in or award profits from a business that grows, processes, and sells marijuana." (Dckt. #188 at 18.) But Plaintiffs' non-contract claims allow the Court to award relief that is not tied to equity or profits of the Defendants' marijuana businesses. For example, under Colorado Revised Statute section 11-51-604, a defendant who is found to violate the Colorado securities act is liable to a plaintiff for "the consideration paid for

the security together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees." So a damage award for Defendants' violations of the Colorado securities act would not be based on Plaintiffs' share of Defendants' businesses or on the profits derived from those businesses—it would be based on the amount Plaintiffs were induced to pay through Defendants' fraud.

And, because the conduct underlying the Plaintiffs' securities claim is "attended by circumstances of fraud, malice, or willful and wanton conduct," Plaintiffs could potentially recover an award of "reasonable exemplary damages," under Colorado Revised Statute section 13-21-102, in addition to the damages authorized under section 11-51-604. *See Mortg. Fin., Inc. v. Podleski*, 742 P.2d 900, 903 (Colo. 1987) ("Exemplary damages are allowed, not as compensation to the injured party for the wrong done, but as a punishment of the wrongdoer as an example to others."). None of this requested relief would be based on a share of illegal profits or would otherwise require any party to violate a provision of the CSA and thus the relief is not barred by the illegality defense. Plaintiffs' other non-contract claims allow the Court to award relief that likewise would not be based on Plaintiffs' equity interests in an illegal business or otherwise implicate any provision of the CSA.

Here Plaintiffs would like to note that exemplary damages are especially appropriate in cases related to the marijuana industry. This is because the incongruity between state and federal law creates a high probability that individuals "who feel defrauded or, in a sense, destroyed by another" will have no recourse in law. *See Mailloux v. Bradley*, 643 P.2d 797, 799 (Colo. App. 1982) (explaining that the first exemplary damages statute was enacted to provide a remedy for those individuals who would not otherwise have a remedy at law); *see id.* n.1 ("If people would

34

gratify the passion of revenge outside of the law, if the law did not help them, the law has no choice but to satisfy the craving itself, and thus avoid the greater evil of private retribution." (quoting O. W. Holmes, The Common Law, Lecture II, Criminal Law (1881)). Accordingly, the Court may award exemplary damages in this case.

In sum, there are multiple ways in which the Court could award relief to Plaintiffs even if the Court determines that the illegality defense should be applied to protect Defendants.

### D. The Court's previous determination allowing Plaintiffs' recission claims to move forward was correct

Finally, the Court should once again rule that Plaintiffs' claims for recission may move forward. As previously noted, the allegations in the Complaint show that Plaintiffs intended to invest in a legal business under state and federal law. For this reason, the Defendants should not be allowed to use the illegality defense as a sword to prevent Plaintiffs from retrieving what was wrongfully or fraudulently taken from them. *See Bild v. Konig*, 2014 WL 3015236, at *8 (E.D.N.Y. July 3, 2014) (explaining that it is "clear that the defense of illegality is disfavored where a 'defaulting party seeks to raise illegality as a sword for personal gain rather than a shield for the public good'"). This would confer an unfair windfall upon the Defendants. *See Ginsburg v. ICC Holdings, LLC*, 2017 WL 5467688 at *8 (N.D. Tex. Nov. 13, 2017) (explaining that courts do not allow the illegality "defense to be used to confer windfalls").

In their motion, Defendants argue that the illegality defense should be applied to Plaintiffs' recission request. They state that the investment was illegal under federal law and that allowing recission would undermine enforcement of federal law. But this argument ignores the allegations in the complaint—which establish that Plaintiffs did not know Defendants would use their investment for illegal purposes and that Plaintiffs lacked the knowledge to distinguish

between legal and illegal forms of the cannabis plant—and it ignores the fact that since 2015 Congress has prohibited the Federal Government from enforcing the CSA in Colorado. So, far from undermining Federal Government efforts in this way, a recission award would be consistent with public policy. Accordingly, the Court should allow Plaintiffs to recover recission damages from Defendants.

In sum, the Court should reject the Defendants' illegality defense for four reasons. First, the marijuana provisions of the CSA are dead letter law in states that have legalized marijuana use. Second, upholding the illegality defense on the facts as pleaded would be inconsistent with public policy. Third, the Court may award a remedy on all of Plaintiffs' claims without ordering either party to commit an illegal act. And fourth, an award of recission damages is not barred by the illegality defense. For these reasons, the Court should reject the Defendants' illegality argument and deny their motion to dismiss.

## II. The Court Should Reject the Defendants' RICO Arguments

Additionally, Defendants argue that Plaintiffs' RICO claims fail for four reasons. The Court should reject each argument.

### a. The illegality defense does not bar plaintiffs' RICO claims

First, Defendants argue that Plaintiffs' RICO claims fail for illegality. For the reasons stated above, the Court should reject this argument. As Plaintiffs explained above, they did not intend to invest in an illegal business. And the Defendants have harmed Plaintiffs, in part, by using Plaintiffs' money to fund illegal activities. Furthermore, the relief requested would not require any party to engage in illegal conduct. As with Plaintiffs' other non-contract claims, relief for Plaintiffs' RICO claims need not be based on Plaintiffs' share of profits or an equity

interest in Defendants' business. Rather, under section 1964(c) of RICO, Plaintiffs may recover the amount of money taken from them plus "threefold the damages [they] sustain[ed] and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). Because the Court can award these amounts without tying them to Defendants' illegal activities, the illegality defense does not bar Plaintiffs' RICO claims.

> b.  **The Court should not dismiss Plaintiffs' eighteenth cause of action**

Defendants argue that Plaintiffs' first RICO claim (their eighteenth cause of action) must be rejected because (1) there is a lack of causation and (2) the claim is derivative nature. In so doing, Defendants misunderstands the nature of the claim.

Plaintiffs' first RICO claim (their eighteenth cause of action) is based on the loss of their choses in action stemming from Defendants' conduct. Plaintiffs have alleged that they intended to invest in a legal business and that Defendants have harmed them by conducting the business in violation of federal law. For the reasons discussed above, Defendants' actions should not bar Plaintiffs' claims under the illegality defense. But, to the extent the Court determines that the Defendants' illegal conduct has rendered relief for Plaintiffs' claims impermissible under the illegality defense, the Defendants' illegal conduct has wrongfully deprived Plaintiffs of a valuable property right in the loss of these choses in action. *See Kirk v. Denver Pub. Co.*, 818 P.2d 262, 267 (Colo. 1991) (explaining that under Colorado state law "'property' includes a 'legal right to damage for an injury'").

In their opposition, Defendants argue, in conclusory fashion without legal citation, that a chose in action is a "conclusory, vague, and circular" business or property interest. But under Colorado law, a chose in action is a recognized property right. Defendants' conclusory assertion

to the contrary does not change that. And there is nothing conclusory, vague, or circular about the harm Plaintiffs allege. A chose in action is defined as the "right to bring an action to recover a debt, money, or thing." *Chose*, BLACK'S LAW DICTIONARY (11th ed. 2019). In their complaint, Plaintiffs have alleged that, to the extent the Court applies the illegality defense to bar Plaintiffs' claims, it was Defendants' illegal conduct that has deprived Plaintiffs of their right to bring a number of causes of action against Defendants. Nothing here is conclusory, vague, or circular.

Plaintiffs have also properly alleged causation. The causes of actions Plaintiffs seek to bring are based on Defendants' violations of securities laws as well as for Defendants' violations of Plaintiffs' common-law rights. But, to the extent the Court upholds Defendants' illegality defense, the Defendants' illegal conduct has deprived Plaintiffs of a right to pursue those claims. In other words, *but for* Defendants' unilateral decision to use Plaintiffs' money for illegal purposes, Plaintiffs would have had a right to bring the many causes of action listed in the complaint against Defendants. So, under the Court's interpretation of the illegality defense, it was Defendants' actions in violation of the CSA that tainted the assets from which Plaintiffs could recover under their other claims and in this way it was Defendants' conduct that caused the loss of Plaintiffs' right to sue Defendants. Thus Defendants' illegal conduct was the fact that triggered the application of the illegality doctrine thereby cutting off Plaintiffs' valuable right to sue Defendants. The loss of this valuable right is what Plaintiffs seek to vindicate in their eighteenth cause of action. This satisfies the causation requirement.

Defendants also argue that Plaintiffs' first RICO claim should be dismissed because it is derivative in nature. But this argument ignores key allegations in the complaint. In their complaint, Plaintiffs allege that in addition to pleading a harm to their personal legal rights,

Plaintiffs have also alleged a harm "in their capacity as shareholders." Opposition at 11.

Defendants focus only on this second alleged harm. To the extent the Court concludes that

Plaintiffs cannot bring direct claims to vindicate harms to themselves in their capacity as

shareholders, the Court can so order. But the alleged harm to Plaintiffs in their capacity as

shareholders is clearly only part of the basis for Plaintiffs' claim. As Defendants' quote in their

opposition, Plaintiffs are also alleging harm to themselves "in their personal capacity." Dckt.

#206 ¶ 251. This alleged harm is the loss of valuable choses of action against Defendants. And

because most of Plaintiffs' causes of action are brought against Kaweske, Peterson, and

Evangelista directly for personal harms, Defendants' derivative-nature argument does not justify

the dismissal of the entire claim.

### c.   The securities bar does not apply to Plaintiffs' third and fourth RICO claims

Next Defendants argue that Plaintiffs' nineteenth (second RICO claim), twentieth (third

RICO claim), and twenty-first (fourth RICO claim) causes of action are barred by the PSLRA

bar. The PSLRA bar forecloses RICO claims that are based upon "conduct that would have been

actionable as fraud in the purchase of securities." 18 U.S.C. § 1964(c). But Defendants misapply

the PSLRA bar to the allegations in Plaintiffs' third and fourth RICO claims.[17]

For Plaintiffs' nineteenth, twentieth, and twenty-first causes of action, Plaintiffs have

alleged RICO violations based on a pattern of violating 18 U.S.C. § 2314, which criminalizes the

transfer of stolen "goods, wares, merchandise, *securities or money*." (emphasis added). Because

the RICO statute explicitly includes violations of section 2314 as a permissible predicate act, the

---

[17] After considering the case law listed in Defendants' opposition, Plaintiffs concede that their
nineteenth cause of action is barred by the PSLRA bar.

fact that Plaintiffs' allegations involve the theft of money or other assets that have some relation to the sale of securities cannot be enough to trigger the PLSRA bar. In fact, at least one federal court has noted that "Congress has recognized that . . . *post-investment* offenses may constitute predicate acts causing racketeering injury for which damages may be recovered under § 1964." *Absolute Activist Value Master Fund Limited v. Devine*, 233 F. Supp. 1297, 1323 (M.D. Florida, February 8, 2017) (emphasis added). With this law in mind, Plaintiffs' twentieth and twenty-first causes of action are not barred by the PLSRA bar.

Plaintiffs' twentieth and twenty-first causes of action are brought derivatively on behalf of Clover Top based on Kaweske and Peterson's transfer of Clover Top assets. Under the alternate theories alleged in these causes of action, Kaweske and Peterson repeatedly stole either money (twentieth cause of action) or other assets (twenty-first cause of action) from Clover Top. The pattern of tortious activity alleged in both of these causes of action took place "post-investment" and would not qualify as conduct actionable as fraud in the purchase or sale of securities. *See*, *cf. Absolute Activist*, 233 F. Supp. at 1322 ("While the RICO predicate acts against Devine are certainly related to the Penny Stock Scheme, the conduct alleged is not 'conduct that would . . . [be] actionable as fraud in the purchase or sale of securities.' The alleged conduct at issue took place after the purchase or sale of securities."). The Court should reject Defendants' PLSRA-bar argument as to the twentieth and twenty-first causes of action.

### d.   **The RICO claims properly allege a continuous pattern**

Defendants argue that Plaintiffs' nineteenth, twentieth, and twenty-first RICO claims fail because they do not allege a continuous pattern. To satisfy RICO's continuous pattern requirement, plaintiffs must satisfy two requirements: (1) relationship and (2) continuity. *See*

*Boon v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1555 (10th Cir. 1992). The relationship requirement is "not a cumbersome one for a RICO plaintiff" and requires only that predicate acts "have the same or similar purposes, results, participants, victims, or other methods of commission." *Id.* Defendants do not contest the relationship requirement is unmet. Instead, they focus only on the continuity requirement. The Court should reject their argument.[18]

To satisfy the continuity prong, a RICO plaintiff must demonstrate either "'a closed period of repeated conduct' or 'past conduct that by its nature projects into the future with a threat of repetition.'" *Id.* These two forms of continuity are respectively referred to as "closed-ended and open-ended continuity." *Id.* Plaintiffs satisfy this requirement in their twentieth and twenty-first causes of action.

In their twentieth and twenty-first causes of action, Plaintiffs have alleged closed-ended patterns of racketeering activity. For closed-ended period of racketeering activity, a plaintiff must demonstrate "a closed period of repeated conduct." *Id.* This contrasts with an open-ended period which "by its nature projects into the future with a threat of repetition." *Id.* In their opposition, Defendants have confused the two forms of racketeering activity by incorrectly attributing the requirements of an open-ended period to both open-ended and closed-ended periods. For example, Defendants frequently suggest that to satisfy the continuity requirement the activity must be presently continuing. *See* Opposition at 16–17.

But that is not the case for closed-ended periods of racketeering activity. *See Luttrell v. Brannon*, 2018 WL 3032993, at *5 (D. Kan. June 19, 2018) ("[T]he Supreme Court made clear

---

[18] The twentieth and twenty-first causes of action are brought by Plaintiff Sensoria derivatively on Clover Top's behalf. As such, Sensoria represents the interests of the other Plaintiff shareholders.

that the continuity requirement may be satisfied either by showing an open-ended pattern, with the threat of violations continuing into the future, *or a closed-ended pattern consisting of repeated conduct in the past of sufficient duration*." (emphasis in original)). For closed-ended periods, the plaintiff must show only that the criminal activity "amount[ed] to . . . long-term criminal activity." *Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010); *see also Erikson v. Farmers Grp., Inc.*, 151 F. App'x 672, 677 (10th Cir. 2005) ("[C]losed-ended continuity requires 'a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months' are insufficient. Open-ended continuity requires a clear threat of future criminal conduct related to past criminal conduct." (citation omitted)). Although courts have not created a bright-line rule for the duration of a closed-ended period of criminal activity, it is generally accepted that a period must extend longer than "a few weeks or months." *Carlson v. Town of Mountain Village, Colorado*, 2019 WL 5819971 at *6 (D. Colo. Nov. 7, 2019). Plaintiffs' RICO claims satisfy this requirement.

In Plaintiffs' twentieth cause of action, they have alleged a closed-ended pattern of racketeering activity that consisted of at least fifteen distinct acts over a two-year period. (¶¶ 279-304.) So Plaintiffs have alleged multiple distinct acts over a period that is much more than the "few weeks or months" that courts have identified to be insufficient. And in so doing, Plaintiffs have not alleged facts to suggest that these fifteen distinct acts were done to accomplish a single discreet purpose, objective, or goal. For this reason, Plaintiffs' claim is distinguishable from the alleged scheme in *Bixler* (cited by Defendants at p.16 of Opposition), in which the Court dismissed Plaintiffs' RICO claim because Plaintiffs alleged a single discrete goal of the defendants.

The same is true for Plaintiffs' twenty-first cause of action. In that cause of action, Plaintiffs alleged a closed-ended pattern of racketeering activity that consisted of at least eleven distinct acts extending over more than a three-year period. And, as with their twentieth cause of action, Plaintiffs did not allege facts to suggest that this pattern of criminal activity was directed at a single purpose, objective, or goal.

Finally, Plaintiffs note that in addition to the criminal activity directed at Clover Top, Defendants currently operate many other businesses and are in the process of securing new investors for those businesses, but that these other investors "in Plaintiffs' position 'remain unaware of the current financial distress'" of Defendants' businesses. (¶¶ 85, 86, 88, 98, 108–120.) From this the Court may infer a threat of future or ongoing criminal activity and that members of the public are at risk from Defendants' longstanding criminal activity.

The Court should reject Defendants' RICO arguments.

### III. There was consideration for Plaintiffs' oral contract with Kaweske

Finally, Defendant Kaweske argues that Plaintiffs' contract claim against him should be dismissed for a lack of consideration. (Opposition at 18–20.) In so doing, Kaweske acknowledges that Plaintiffs have alleged an the existence of an agreement between Kaweske and Plaintiffs to refrain from operating Clover Top illegally. This is correct: in their complaint, Plaintiffs alleged that Kaweske promised to operate Clover Top legally and that in exchange for this promise, Plaintiffs invested in Clover Top.

But Kaweske argues that this is not enough to support a contract claim against Kaweske because Kaweske made this promise before Plaintiffs invested in Clover Top and because the only applicable consideration—the investments—were paid to Clover Top, not Kaweske. In

other words, Kaweske argues that there was no consideration given in exchange for his promise to operate Clover Top legally. This is incorrect.

Under Colorado law, "any benefit to a promisor or any detriment to a promise at the time of contract—no matter how slight—constitutes adequate consideration." *Lucht's Concrete Plumbing, Inc. v. Horner*, 255 P.2d 1058, 1061 (Colo. 2011). Consideration may take the form of "forbearance by one party" to refrain from doing something they are entitled to do. *Id.* It can take the form of providing someone with "the ability to do business." *Smith v. Ackerman*, 2004 WL 3728357 at *6 (D. Colo. Jan. 5, 2004). Further, a "[b]enefit to a third party is sufficient consideration for a contract." *PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp. 1219, 1224 (D. Colo. 2009). "onsideration need not be in writing. It may be proved by parol evidence or inferred." *Crossroads West Ltd. Liab. Co. v. Town of Parker*, 929 P.2d 62, 64 (Colo. App. 1996).

In this case, there are at least two forms of consideration. First, Kaweske as the promisor was benefited directly. In exchange for his promise to operate Clover Top legally, Plaintiffs invested in Clover Top, which provided a benefit to Kaweske as a shareholder of Clover Top (by increasing the value of Kaweske's shares) and as an officer directing Clover Top's ongoing business (by providing Kaweske with the financial flexibility and ability to run Clover Top's business). Either of these constitutes a benefit—even if slight—to Kaweske.

Second, by promising to refrain from operating Clover Top illegally, Kaweske secured investments for Clover Top's benefit, as a third party to the contract. This satisfies the consideration requirement. *PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp. 1219, 1224 (D. Colo. 2009) ("Benefit to a third party is sufficient consideration for a contract.").

Accordingly, Kaweske's contract argument should be rejected.

44

## CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss should be denied.

If any portion of the motion to dismiss is granted for any reason, the Court should grant

the plaintiffs leave to amend to address any identified pleading deficiencies.

DATED this 15th day of October, 2021.

CHRISTIANSEN LAW, PLLC


_____/s/ Stephen K. Christiansen_____
Stephen K. Christiansen
CHRISTIANSEN LAW, PLLC
311 South State Street, Ste. 250
Salt Lake City, UT 84111
Telephone: (801) 716-7016
Facsimile: (801) 716-7017
Email: steve@skclawfirm.com
*Attorney for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2021, I caused a true and correct copy of this pleading

to be served electronically upon all counsel of record via the Court's CM/ECF system, and upon

Christopher S. Peterson via email, per consent, to chris@blinghouse.com.


_____/s/ Stephen K. Christiansen_____