IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00942-MEH

SENSORIA, LLC, directly on its own behalf and derivatively on behalf of
CLOVER TOP HOLDINGS, INC., a Delaware corporation;
GORDON MORTON;
ROGER AND ROBIN SMITH;
DENNIS AND LAURA GRIMMER;
GREENHOUSE 5, LLC;
AARON GARRITY;
GARRETT SCHIFFMAN;
LANCE SCHIFFMAN;
KENNETH D. HOUSE; and
MARC LESSER,

       Plaintiffs,

v.

JOHN D. KAWESKE;
CHRISTOPHER S. PETERSON;
CLOVER TOP HOLDINGS, INC., a Delaware corporation;
CLOVER TOP HOLDINGS, a Colorado corporation;
AJC INDUSTRIES, LLC;
DURANGO MANAGEMENT, LLC;
SUNLIFE AG, LLC;
MMJ 95, LLC;
TWEEDLEAF LLC, a Colorado limited liability company;
TWEEDLEAF, LLC, a Delaware limited liability company;
LIFESTREAM HOLDINGS, LLC;
ORDWAY FARMS, LLC;
NORTH STAR HOLDINGS a/k/a NORTH STAR HOLDINGS, INC.;
MANUEL WELBY EVANGELISTA a/k/a WELBY EVANGELISTA;
DJDW, LLC;
JW COLORADO, LLC;
JW ORDWAY, LLC;
JW TRINIDAD, LLC;
BRIAN TANNENBAUM;
TANNENBAUM & TROST, LLC, f/k/a TANNENBAUM,
TROST & BURK, LLC; and
DOES 1-100,

       Defendants.

---

# ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

    Before the Court are the Motion to Dismiss (ECF 215) by Defendants John Kaweske

("Kaweske") and entities related to him ("Kaweske Entities") and the Motion to Dismiss (ECF 216) by Defendants Welby Evangelista, North Star Holdings, LLC, and DJDW, LLC ("Evangelista Defendants"). The Motions are fully briefed, and the Court finds that oral argument will not materially assist in their adjudication. For the reasons that follow, the Motions are granted in part and denied in part.

## BACKGROUND

### I.     Alleged Facts

For purposes of this ruling, the Court accepts as true the factual allegations—but not any legal conclusions, bare assertions, or conclusory allegations—that Plaintiffs raise in their Third Amended Complaint ("TAC"). ECF 206. *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (accepting as true a plaintiff's factual allegations for purposes of Fed. R. Civ. P. 12(b)(6) analysis).

#### A.     The Creation of the Clover Top Holdings, Inc. Investment Vehicle

Defendant John D. Kaweske ("Kaweske") is a citizen of Colorado. ECF 206 at ¶ 11. He was subject of four administrative proceedings and three lawsuits regarding inappropriate dealings with client funds or securities transactions. *Id*. at ¶ 48. He expended great effort to hide his identity and that history. *Id*. at ¶¶ 49-51. Defendant Christopher S. Peterson ("Peterson") is a citizen of either Colorado or Arizona. *Id*. at ¶ 12.

At issue in this lawsuit is Clover Top Holdings, Inc. which Kaweske, Peterson, and Peterson's wife incorporated in September 2015. *Id*. at ¶¶ 34. They were its majority owners and served as its officers. *Id*. at ¶¶ 34-36. Clover Top Holdings, Inc. is a Delaware corporation. *Id*. at ¶ 13. Its principal place of business was in Colorado (*id*.), although it was not registered to do business in Colorado until September 22, 2017 (*id*. at ¶¶ 52(a), 94). It no longer is an active corporation. *Id*. at ¶¶ 111-114.

2

Kaweske, Peterson, and Peterson's wife formed Clover Top Holdings, Inc. "to engage in all legal aspects of the cannabis business, beginning in Colorado and expanding elsewhere as the business grew and as state and federal laws changed across the country." *Id*. at ¶ 34. In October 2015, Clover Top Holdings, Inc. acquired TweedLeaf Delaware, which possessed the federal trademark and service mark registrations for the "TWEEDLEAF" word and drawing. *Id*. at ¶¶ 55-56.

On October 30, 2015, Clover Top Holdings, Inc. retained Brian Tannenbaum, Esq. of Tannenbaum, Trost & Burk, LLC (the law firm's name at the time) to provide legal services "regarding the purchase and/or sale of certain marijuana licenses" as well as "any other services [that it] may request from time to time." *Id*. at ¶ 58. Clover Top Holdings, Inc. retained the Tannenbaum Defendants "for both cannabis and corporate law." *Id*. at ¶ 59. Kaweske oversaw all cultivation operations for Clover Top Holdings, Inc. as well as company finances, taxes, licenses, and legal matters in tandem with the Tannenbaum Defendants. Peterson managed dispensary operations, patient care, and online/offline marketing for the TweedLeaf business. *Id*. at ¶ 72.

In January 2016, Clover Top Holdings, Inc. bought "two real estate holdings in Colorado Springs, one a retail building and the other a warehouse." *Id*. at ¶ 61. On January 26, 2016, Durango Management, LLC ("Durango") was created to hold properties and leases for Clover Top Holdings, Inc. as its real estate management company. *Id*. at ¶ 62. On February 1, 2016, "Durango purchased the two real estate holdings that were subject of Clover Top [Holdings, Inc.'s] January 2016 contract." *Id*. at ¶ 63. On March 11, 2016, Durango leased one of the properties to AJC Industries, LLC d/b/a Front Range Alternative Medicines and d/b/a FRAM ("AJC"). *Id*. at ¶ 66. Kaweske is AJC's sole member. *Id*. at ¶ 15. An appraiser did not regard it as an arms-length transaction. *Id*. at ¶ 66.

In March 2016, Clover Top Holdings, Inc. purchased two existing marijuana licenses from AJC. *Id.* at ¶ 64. The Tannenbaum Defendants assisted with the transaction. *Id.* At the time, Kaweske was the only Clover Top Holdings, Inc. principal who had the Colorado residency required for a marijuana license. *Id.* at ¶ 65.

**B.     The Initial Investments**

In late 2015, Kaweske and Peterson solicited Peterson's sister, Robin Smith, and her husband, Roger Smith, to invest in Clover Top Holdings, Inc. Kaweske and Peterson portrayed Clover Top Holdings, Inc. as the parent corporation for all future cannabis operations and brands, and they reassured the Smiths that the operation was on the "up and up." Kaweske and Peterson emphasized that they had multiple business licenses and trademarks (including a federal trademark) for their operations and products. Based on those representations, the Smiths invested $50,000 in Clover Top Holdings, Inc. in October 2015. *Id.* at ¶ 37. The Smiths are citizens of California. *Id.* at ¶ 4.

Between January and March of 2016, Kaweske and Peterson solicited Plaintiff Gordon Morton ("Morton") to invest in Clover Top Holdings, Inc. *Id.* at ¶ 38. They portrayed it as "the holding company or the 'mother ship' for all cannabis-related entities, technologies, and brands in Colorado and expanding beyond Colorado as its success grew." *Id.* at ¶ 39. The greater enterprise would include "dispensaries, grow operations, extraction technologies, intellectual property, other future ancillary entities, and all similar services and businesses." *Id.* Clover Top Holdings, Inc.'s shareholders would receive the profits as well as "prompt repayment of initial investments and distributions." *Id.* at ¶¶ 39, 52.

To Morton and other investors, Kaweske emphasized his extensive experience, expertise, and special knowledge in the field and highlighted the legal nature of the venture and its anticipated

4

nationwide expansion. *Id.* at ¶¶ 38, 45. The implication was that Clover Top Holdings, Inc.'s operations were or would become lawful under federal law. Nor did Kaweske and Peterson honor their representations to run the entity for Plaintiffs' benefit. *Id.* at ¶ 52.

Written materials explained that Clover Top Holdings, Inc. was "established to make investments and operate businesses in the burgeoning legal cannabis industry" and for creating "a national brand for medicinal dispensaries, online store and cannabis and hemp-based products." *Id.* at ¶ 40. Clover Top Holdings, Inc. was described as a Delaware corporation based in Colorado Springs. It owns "an existing medical marijuana commercial location as well as a cannabis cultivation facility and is integrating a second fully operational and licensed medicinal cannabis business into the newly purchased locations." *Id.* Its existing business "generates between $60,000–$80,000 per month in gross revenues." *Id.* It has an "11,000 square foot cultivation facility, which is capable of growing over 4,000 plants and producing in excess of $400,000 a month of wholesale cannabis." *Id.* It owns a "medical marijuana dispensary located in a prime retail location" and will open "a new medical dispensary chain called TweedLeaf[TM]." *Id.* Lastly, Clover Top Holdings, Inc.'s assets include intellectual property as well as proprietary hemp- and CBD-based products "that are currently legal to sell nationwide." *Id.*

On April 4, 2016, Morton paid $100,000 for 100,000 shares. Kaweske told him that he was the first outside investor. The investment was made pursuant to a Subscription Agreement for Preferred Shares. *Id.* at ¶ 41.

Contemporaneously, Kaweske and Peterson were soliciting additional investors. Garrett Schiffman, Lance Schiffman, and Aaron Garrity received the same written materials as Morton as well as the assurance that Kaweske and Peterson already had business licenses for their various operations. Garrett Schiffman and Lance Schiffman each paid $60,000 for Clover Top Holdings,

Inc. shares. Through his solely owned entity, Greenhouse 5, LLC, Aaron Garrity paid $100,000 for Clover Top Holdings, Inc. shares. *Id.* at ¶ 42. All three individuals and the Greenhouse 5, LLC entity are Utah citizens.

Kaweske and Peterson convinced Peterson's in-laws, the Grimmers, to invest. As with the other solicitations, Kaweske and Peterson sent them the same written materials and represented Clover Top Holdings, Inc.'s business operations as legitimate and legal. They possessed the necessary licenses, and the operation already was up and running. Between June 2016 and January 2017, the Grimmers paid a total of $75,000 for Clover Top Holdings, Inc. shares. *Id.* at ¶ 43. The Grimmers are citizens of Idaho. *Id.* at ¶ 5.

Lance Schiffman introduced Kenneth House to Kaweske and Peterson. They had multiple conversations and received the written materials. In July 2016, House bought $30,000 in Clover Top Holdings, Inc. stock. *Id.* at ¶ 46. House is a Utah citizen. *Id.* at ¶ 9.

In April 2016, Marc Lesser paid $60,000 for Clover Top Holdings, Inc. shares based on his trust in Peterson and the investment solicitation. *Id.* at ¶ 47. Lesser is a California citizen. *Id.* at ¶ 10.

The Smiths, Morton, Garrett Schiffman, and Lance Schiffman were familiar with neither the marijuana industry nor federal marijuana law. *Id.* at ¶ 45. Kenneth House and Marc Lesser knew that the Clover Top Holdings, Inc. venture was lawful under Colorado law but not under federal law. *Id.* at ¶ 47. Lesser understood there to be "gray areas" in the law regarding cannabis, but relied on Kaweske and Peterson's assurances that the cannabis industry had started moving toward legal profits. Lesser assumed there already were legal ways to make profits. *Id.*

6

**C.     Purported Expansion of Clover Top Holdings, Inc.**

Peterson's father-in-law, Dennis Grimmer, also owned part of the Durango entity and served as its manager. *Id*. at ¶¶ 62-63, 69. On June 27, 2016, he exchanged his Durango shares for Clover Top Holdings, Inc. shares. *Id*. at ¶ 69. The Tannenbaum Defendants facilitated the exchange (*id*.) which presumably increased Clover Top Holdings, Inc.'s ownership of Durango. In a filing with the Colorado Secretary of State on July 6, 2016, Durango identified Clover Top Holdings, Inc. as its sole owner. *Id*. at ¶ 70.

On August 8, 2016, Clover Top Holdings, Inc. issued its first investor update. It reported increasing sales over the prior three months and plans to open a second TweedLeaf medical dispensary. *Id*. at ¶ 73.

In October 2016, Clover Top Holdings, Inc. bought additional marijuana licenses from MMJ 95, LLC ("MMJ"). *Id*. at ¶ 76. MMJ was formed in October 2015 as a cannabis-related business (*id*. at ¶ 57), and Kaweske was its sole member (*id*. at ¶¶ 18, 83). Contemporaneously, Kaweske stated that an MMJ license was being transferred to Tweedleaf, LLC (*id*. at ¶ 77), an entity that Kaweske owned separate and apart from the Clover Top Holdings, Inc. enterprise and the TweedLeaf Delaware entity (*id*. at ¶ 65).

Morton visited Colorado Springs and met with Kaweske in early November 2016. Kaweske told him that the business was making money and promised to pay him first. *Id*. at ¶ 78.

Morton formed Sensoria, LLC ("Sensoria") on November 17, 2016. Sensoria paid $125,000 for an additional 125,000 shares. *Id*. at ¶ 81. Clover Top Holdings, Inc. issued a stock certificate dated November 25, 2016 that Peterson and Kaweske signed. *Id*. at ¶ 82. All of Morton's investments in Clover Top Holdings, Inc. ultimately were made and accounted through Sensoria. *Id*. at ¶ 81.

7

On November 16, 2016, Kaweske incorporated Sunlife AG, LLC ("Sunlife") as a cannabis growing and cultivation business. Peterson stated in 2019 that Sunlife was intended to be Clover Top Holdings, Inc.'s "wholly owned real estate and property management company [for] holding properties and leases in Ordway, Colorado." *Id*. at ¶ 80. However, Kaweske was Sunlife's sole member. *Id*.

Clover Top Holdings, Inc. issued another investor update on January 20, 2017. Monthly sales from the TweedLeaf business were reported, and the construction of a second dispensary was announced. Cultivation, warehouse, and production spaces were said to be expanding. *Id*. at ¶ 84.

In February 2017, Welby Evangelista ("Evangelista") and his entity, DJDW, LLC ("DJDW"), invested in Clover Top Holdings, Inc. *Id*. at ¶ 85. He served as the TweedLeaf brand's business director, worked onsite in Colorado, provided Sensoria access to the TweedLeaf locations, and raised additional investment money. He also took over the investor updates (which now were being done informally over the telephone rather than in writing), touting success in terms of money made and TweedLeaf website traffic volume. *Id*. at ¶ 86.

On June 19, 2017, a corporate entity by name of "XLeaf" was formed. It was intended either to be owned by Clover Top Holdings, Inc. or to serve as a merchant account for AJC. XLeaf later became "XLEAF Labs" that made and sold cannabis concentrate. *Id*. at ¶ 100.

In August 2017, Kaweske began developing marijuana business operations in Ordway, Colorado. Through the AJC entity, Kaweske and Peterson leased a greenhouse there. *Id*. at ¶ 89. AJC obtained marijuana licenses, and 108 acres of land were bought. *Id*. at ¶ 90. Additional greenhouses and a warehouse building were acquired. Funding for the Ordway expansion came from Clover Top Holdings, Inc., and these acquisitions purportedly belonged to it (through its ownership of Sunlife). *Id*. at ¶ 91. However, Kaweske now claims that the Ordway-related assets

and entities belong to him. *Id*.

Clover Top Holdings, Inc. was registered to do business in Colorado for the first time on September 22, 2017. *Id*. at ¶ 94.

On October 12, 2017, Ordway Farms LLC ("Ordway Farms") was created. Its initial member was identified as "CLOVERTOP HOLDINGS, INC." *Id*. at ¶ 95.

On December 2, 2017, Clover Top Holdings, Inc. opened its second TweedLeaf dispensary for business. *Id*. at ¶ 97.

On December 10, 2017, "Kaweske shut Peterson and his wife out of Clover Top Holdings, Inc. and purported to terminate their employment with [it]." Kaweske blamed Clover Top Holdings, Inc.'s "current financial distress" on their "exorbitant spending." Sensoria was unaware of this development. *Id*. at ¶ 98. Ultimately, several lawsuits were filed in Colorado state court regarding disputes between Peterson and Kaweske. *Id*. at ¶ 135.

Peterson later stated that the "intended assets and subsidiaries" of Clover Top Holdings, Inc. before December 2017 "included at least TweedLeaf Delaware, Durango, AJC, MMJ, Sunlife, Ordway Farms, and the XLeaf and XLeaf Labs names, and their holdings and assets." *Id*. at ¶ 139.

On February 28, 2018, Kaweske bought a home in Colorado Springs for $525,000.00. *Id*. at ¶ 101.

On September 10, 2018, TweedLeaf Delaware abandoned the "TWEEDLEAF" service mark. *Id*. at ¶ 105.

In late 2018 and early 2019, Plaintiffs began to hear indications of trouble with the state of their investment. *Id*. at ¶ 107. Morton first became aware of problems on November 3, 2018 when "without leadup or warning, Evangelista called and texted Morton multiple times via cell phone and made physical and financial threats against him, orally and by text, including threatening to

kill Morton and his family." Evangelista accused Mortion of "stealing his money, asserting Morton's involvement in a 'scam' against [him]." Evangelista told Morton that Sensoria and all shareholders in Clover Top Holdings, Inc. were "f***ed." He demanded payment of millions of dollars from Morton and threatened legal action. *Id*. at ¶ 106.

### D.    Kaweske's Competing Marijuana Enterprise

Simultaneous with the creation of Clover Top Holdings, Inc., Kaweske began a separate marijuana operation that in effect competed with it. Moreover, the assets that originally belonged (or were intended to belong) to Clover Top Holdings, Inc. became part of that other competing enterprise. *Id*. at ¶¶ 110, 139.

In November 2015, Peterson incorporated another entity by name of "Clover Top Holdings" but in Colorado rather than in Delaware ("Clover Top Colorado"). *Id*. at ¶¶ 14, 118. Unlike Clover Top Holdings, Inc. (in which Plaintiffs invested), the Clover Top Colorado entity remains an active corporation. *Id*. at ¶ 118.

Kaweske asserts ownership over AJC, an entity that was meant to be Clover Top Holdings, Inc.'s asset and the holder of its marijuana licenses. *Id*. at ¶¶ 65, 71. In November 2016, Kaweske registered the TweedLeaf name and logo trademarks with AJC. *Id*. at ¶ 79. On September 12, 2017, Kaweske assumed unlimited authority to transfer real property held in Durango's name. *Id*. at ¶ 92.

On January 18, 2018, Kaweske and Evangelista incorporated JW Colorado, LLC ("JW Colorado") and JW Ordway, LLC ("JW Ordway") as cannabis businesses. The Tannenbaum Defendants assisted with JW Ordway's filings. *Id*. at ¶ 99. On July 12, 2018, Kaweske and Evangelista formed JW Trinidad, LLC ("JW Trinidad"). *Id*. at ¶ 102. On August 3, 2018, Evangelista incorporated North Star Holdings ("North Star") as a cannabis business, for which

Kaweske served as an officer. *Id*. at ¶¶ 23, 103. The Tannenbaum Defendants were listed as North Star's registered agent. *Id*. at ¶ 103. North Star uses TweedLeaf as one of its brands. *Id*. at ¶ 109.

On September 5, 2018, Kaweske replaced Clover Top Holdings, Inc. as Ordway Farms' sole member. *Id*. at ¶ 104. Without Plaintiffs' knowledge, Kaweske and Evangelista sold securities in Ordway Farms contrary to Clover Top Holdings, Inc.'s interests. *Id*. at ¶¶ 88, 104.

On January 10, 2019, Kaweske and Evangelista registered the sale of North Star securities. TweedLeaf, TweedLeaf Dispensaries, XLeaf Labs, and Ordway Farms were listed as products and services related to the North Star securities. *Id*. at ¶ 109.

Clover Top Holdings, Inc.'s registration with Colorado became delinquent on February 1, 2019 after not filing a Periodic Report. Its corporate status with Delaware became void on March 1, 2019 when it did not pay the annual franchise tax. It owes the State of Delaware $108,566.68. *Id*. at ¶¶ 111-113.

On August 19, 2019, Kaweske created Lifestream Holdings, LLC ("Lifestream"), whose registered agents are the Tannenbaum Defendants and which does business as TweedLeaf. *Id*. at ¶ 131. On September 10, 2019, JW Colorado registered the "TWEEDLEAF" trademark and service mark. *Id*. at ¶ 132.

### E. Plaintiffs Inquire About Their Investment

Plaintiffs became concerned that other investors were acquiring ownership of Clover Top Holdings, Inc. in a way that was diluting the value of their investment. *Id*. at ¶ 120. They received no substantive answers or information from Clover Top Holdings, Inc. or its officers. *Id*. at ¶¶ 120-122. In February 2019, Kaweske told Morton that events and circumstances had rendered Sensoria's investment "no longer relevant." Kaweske added, "Technically, I don't have to give you anything because technically you don't own anything." *Id*. at ¶ 124. Evangelista threatened to

countersue Plaintiffs and claimed losses ten times greater than Sensoria's. *Id*. at ¶ 136.

Sensoria's attempt at private resolution was unsuccessful. *Id*. at ¶ 126. A demand letter yielded no substantive relief. *Id*. at ¶ 136.

Plaintiffs believe that Clover Top Holdings, Inc.'s "assets, holdings, and subsidiaries . . . have been transferred away," rendering their investment irrelevant. *Id*. at ¶ 123. "Plaintiffs have not received back any of their initial investment, let alone any return on that investment, nor any documentation accounting for the investment apart from share certificates for common stock." *Id*. at ¶ 127. Instead, Kaweske "is now controlling the TweedLeaf brand and operations apart from Clover Top [Holdings, Inc.] and under his separate entities." *Id*. at ¶ 133. The Tweedleaf website lists six retail locations in Colorado. Lifestream and North Star have connections to that website (*id*.), and North Star includes "TweedLeaf" as one of its brands (*id*. at ¶ 109).

## II.   Defendants

The Kaweske Defendants consist of Kaweske and several entities under his control (the "Entity Defendants"). The Entity Defendants are JW Colorado, JW Trinidad, JW Ordway, MMJ, AJC, Sunlife, Ordway Farms, Durango, Lifestream, and TweedLeaf LLC (incorporated in Colorado). Plaintiffs argue that it was through these entities that Kaweske siphoned off assets and cash that belonged to the Clover Top Holdings, Inc. venture.

Neither TweedLeaf Delaware nor Clover Top Holdings, Inc. has answered the Complaint, and both are in default. ECF 95 at ¶¶ 6, 13. "Notwithstanding any allegation set forth [in their TAC]," Plaintiffs clarify that "any claim on which Clover Top [Holdings, Inc.] has previously defaulted is not advanced against Clover Top [Holdings, Inc.] in this Third Amended Complaint." ECF 206 at ¶ 13.

The Clover Top Colorado entity that Kaweske also incorporated has not appeared in this lawsuit. It appears to be in default. ECF 123.

Plaintiffs also sue Evangelista and the two entities, North Star and DJDW, associated with him ("Evangelista Defendants"). They allege that Evangelista managed Clover Top Holdings, Inc. with Kaweske, and like Kaweske, Evangelista converted its assets for his own benefit. Plaintiffs argue that the separate, competing business that Kaweske and Evangelista created for themselves is in practical effect Clover Top Holdings, Inc. Plaintiffs bring no claims unique to them. The Evangelista Defendants filed their own Motion to Dismiss (ECF 216), but they simply adopted the arguments that the Kaweske Defendants raise. Therefore, the Court does not discuss the Evangelista Defendants separately.

For ease of reference and to simplify the below legal analysis, the Court's use of the term "Defendants" means those individuals or entities against whom the Plaintiffs bring the cause of action being discussed. Moreover, it means only those Defendants who have file the Motions to Dismiss under review. For example, the Court's below reference to "Defendants" does not include Peterson.

Both Peterson and the Tannenbaum Defendants have answered the TAC. ECF 211, 219. Because the Tannenbaum Defendants have not moved to dismiss the TAC, the Court excludes the allegations that Plaintiffs add about their involvement in the greater scheme.

## LEGAL STANDARD

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at

678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Iqbal*, 556 U.S. at 679–80. Second, a court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"

*Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*.

## ANALYSIS

Plaintiffs complain that Defendants harmed the Clover Top Holdings, Inc. business venture and deprived them of the value of their investment. Clover Top Holdings, Inc. also seeks redress for harm done to it, and it proceeds through Plaintiff Sensoria who is acting on its behalf. Collectively, Plaintiffs express Defendants' wrongful actions through several different causes of action.

## I.     Available Means of Judicial Relief

At issue is whether Clover Top Holdings, Inc. engaged in illegal conduct that hinders the Court's ability to remedy the damages Plaintiffs suffered. Thus, the primary legal question raised in the Motions is whether their claims should be dismissed on that basis as a matter of law. The Court has addressed this same issue twice before. Having now revisited the matter and after considering this newest round of briefing, the Court affirms that the illegality defense does apply and with dispositive effect.

### A.     The Nature of the Clover Top Holdings, Inc. Enterprise

In the previous dismissal order, this Court observed that marijuana "lies at the heart of the business" in which Plaintiffs had invested. *Sensoria, LLC v. Kaweske*, — F. Supp. 3d —, 2021 WL 2823080, at *9 (D. Colo. July 7, 2021). That observation remains true for the TAC. Plaintiffs

15

describe Clover Top Holdings, Inc. as a "mother ship" for multiple entities to produce, process, and sell marijuana and related products. ECF 206 at ¶ 39. It would do so on a large scale, beginning with an "11,000 square foot cultivation facility . . . capable of growing over 4,000 plants" and "a 1,500 square foot medical marijuana dispensary located in a prime retail location." *Id*. at ¶ 40. Plaintiffs expected starting revenues in excess of $400,000 a month. *Id*. In comparison to the initial complaint, Plaintiffs now expressly deny any intention to invest in a business that violated federal law. "[T]he Smiths, Morton, and the Schiffmans understood that Clover Top's activities were compliant with state *and federal* law." *Id*. at ¶ 45 (emphasis added). They also describe their involvement as that of "passive, out-of-state investors" who lacked "special knowledge about the [cannabis] industry" and the true extent of Clover Top Holdings, Inc.'s illegal operations. *Id*. at ¶ 159. They relied on Kaweske to operate the business lawfully.

Plaintiffs describe their investment in Clover Top Holdings, Inc. and their relationship with Kaweske in a way that distances them from the nature of the business. The pleading amendments thereby serve to avoid the impact of the illegality affirmative defense. Although the amendments come after Defendants raised the illegality defense, the Court still accepts them as true for purposes of this Rule 12(b)(6) review, as it did in the prior dismissal order, *Sensoria*, 2021 WL 2823080 at *7, addressing the same point. The plaintiff in *Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, 861 F.3d 1052, 1056 (10th Cir. 2017) made similar amendments in an equivalent situation. Although the Court accepts as true Plaintiffs' allegations about their subjective perceptions and intentions, ultimately they have little effect on the outcome of the illegality defense issue.

Marijuana not only lies at the heart of the investment but at the heart of this lawsuit, as well. The primary legal question presented is how it affects Plaintiffs' ability to obtain judicial

relief.

**B.    The Controlled Substances Act, 21 U.S.C. §§ 802,** *et seq***.**

"The overarching issue," as this Court already has framed it, was the "direct involvement

in the growing and selling of marijuana" that the enterprise was anticipated to have. *Sensoria*, 2021

WL 2823080 at *7. Although presumably lawful under Colorado law, Clover Top Holdings, Inc.'s

planned activities were not under the federal Controlled Substances Act, 21 U.S.C. §§ 802, *et seq*.

("the CSA"). Marijuana is a Schedule 1 controlled substance. *Hemphill v. Liberty Mut. Ins. Co.*,

No. 10-861-LH/RHS, 2013 WL 12123984, at *2 (D.N.M. Mar. 28, 2013). Not only does the CSA

make it unlawful to grow, possess, dispense, and distribute marijuana, but it creates a

comprehensive scheme that criminalizes the full range of marijuana-related activities, including

providing operational space for such activities. *In re Arenas*, 535 B.R. 845, n.3 & n.40 (10th Cir.

2015). Marijuana-related activities carry both a risk of criminal conviction and forfeiture of

property and assets. *In re Malul*, 614 B.R. 699, 712 (D. Colo. 2020). Moreover, the CSA continues

to apply in full force even in states that have de-criminalized marijuana. *Gonzales v. Raich*, 545

U.S. 1 (2005). Simply put, "it is illegal for any private person to possess marijuana for any

purpose," even as a medical treatment. *River N. Props., LLC v. Denver*, No. 13-cv-01410-CMA-

CBS, 2014 WL 7437048, at *3 (D. Colo. Dec. 30, 2014).

In both the TAC and their Response, Plaintiffs stress the federal government's softening

approach to marijuana. The Executive Branch may chose not to enforce the CSA where marijuana

is lawful under state law. Congress may be contemplating decriminalizing marijuana at the federal

law level. In *Standing Akimbo, LLC v. U.S.*, 141 S.Ct. 2236 (2021), Justice Thomas questioned the

CSA's comprehensive approach to the complete criminalization of marijuana upon which the

*Raich* opinion is premised. Nevertheless, the CSA was in full force in 2016 when Plaintiffs bought

into Clover Top Holdings, Inc., and it remains federal law today. None of the federal decisions cited herein has treated the CSA as dead letter law, and *Raich* remains binding precedent on this Court.

Plaintiffs also emphasize how some cannabis-related products do not violate the CSA, but those areas of lawful commercial activity are tangential. The focus of the business was marijuana in its federally unlawful form and on a substantial scale.

Regardless of Plaintiffs' subjective intent, the venture's areas of CSA-compliant activities, and reduced federal enforcement, the pleadings still describe Clover Top Holdings, Inc. in a way that implicates the CSA. Clover Top Holdings, Inc. was created to oversee the growing, processing, and selling of marijuana. Had Defendants managed the enterprise as represented, Plaintiffs would have benefitted financially from those activities. Thus, the TAC raises the same CSA concerns that *In re Malul*, 614 B.R. 699 (D. Colo. 2020), *Bart St. III v. ACC Enters., LLC*, No. 17-cv-00083, 2020 WL 1638329 (D. Nev. Apr. 1, 2020), and *Polk v. Gontmakher*, No. 18-cv-01434, 2020 WL 2572536 (W.D. Wash. May 21, 2020) had. How the marijuana aspect of the business affects the legal viability of Plaintiffs' causes of action and the available means of judicial redress remains a relevant question.

## C.    The "Illegality" Affirmative Defense and Related Bars to Recovery

As a general rule, a court will not compel the performance of a contract term that requires violating a law. *Bassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005) (declining to enforce a financial guarantee that would be inconsistent with an economic sanctions provision). Here, it is the CSA that must be avoided. Nor may a court enforce a contract term that is contrary to public policy. *McCracken v. Progressive Direct Ins. Co.*, 896 F.3d 1166 (10th Cir. 2018) (declining to enforce a negotiated release of a tort claim that while lawful, was contrary to Colorado public policy for

providing tort victims UM/UIM coverage). However, the mere fact that unlawful activity is involved in some way does not automatically foreclose contract relief; this includes contracts that might bear some relationship to marijuana. *Sensoria*, 2021 WL 2823080 at *8.

The purpose of the public policy rule is not to protect the contracting party. Rather, the inquiry ensures that enforcement of a contract will not be detrimental to the public good. It applies when the contrary public policy clearly outweighs the interest in contract enforcement. *McCracken*, 896 F.3d at 1172. There are several factors to consider in making that determination: relative moral culpability, deterrence of illegal conduct, avoidance of unjust windfalls and forfeitures, and how best to give effect to the public policy. Of them, the guiding "core principle" is "that courts may not themselves order violations of the law." *Bassidji*, 413 F.3d at 937-39.

Plaintiffs argue that the public policy inquiry weighs in their favor. Not only did Defendants steal their investment money, but they deprived Plaintiffs of profits that the promised enterprise would earn them. On the basis of those allegations, Plaintiffs argue against allowing Defendants to use the illegality defense to shield themselves from liability. Permitting them to keep the stolen money and divesting them of the business would give Defendants an unjust windfall. Plaintiffs make a strong argument on these allegations.

However, there are countervailing factors. The involvement of marijuana was neither tangential nor unexpected. Plaintiffs knew what the essential nature of the undertaking would be. They must explain how this federal court can serve the public's interests if it vindicates their ownership of a CSA-infringing enterprise. Essentially, they ask this Court to tolerate one violation of law (the CSA) to redress others, or to enjoin conduct that is lawful under state law to permit redress in the federal forum. They may not be lawyers and may not have appreciated the full legal complexity, but ignorance of the law is no defense, *U.S. v. Benton*, 988 F.3d 1231, 1239 (10th Cir.

2021) (citing the maxim in the context of a defense to criminal prosecution). Plaintiffs are sophisticated investors who bought shares after negotiating with Kaweke and the opportunity for due diligence. This Court also notes that the illegality affirmative defense and related bars are a function of Plaintiffs' choice of venue. Plaintiffs filed this lawsuit in federal court, not Colorado state court in which the illegality issue possibly may play a lesser role. By filing suit in federal court, it was Plaintiffs themselves, and not Defendants, who deprived them avenues of relief and "choses in action." In light of the overall circumstances, the public policy consideration does not militate against application of the illegality defense.

Nor is the illegality affirmative defense limited to the contract context. The same core principle that prevents a court from compelling acts that violate the law applies in other respects. Illegality can bar a tort claim. *Mischalski v. Ford Motor Co*., 935 F. Supp. 203, 205 (E.D.N.Y. 1996) (noting that the defense also applies "to actions arising in tort, under the theory that one should not be rewarded for voluntary participation in an illegal act or profit from his or her own wrongdoing"). In *J. Lilly, LLC v. Clearspan Fabric Structures Int'l, Inc*., No. 18-cv-01104, 2020 WL 1855190 (D. Or. Apr. 13, 2020), the plaintiff sought lost profits as damages "for the breach of contract, breach of warranty, and negligence arising from [its] lease of a commercial greenhouse" used for marijuana cultivation. *Id*. at *1. Because the court could not award plaintiff lost profits from the sale of marijuana, the plaintiff was precluded from proceeding on its claims. *Id*. at *12. A plaintiff may not base a Section 1983 claim on a legal interest in property used to cultivate medical marijuana. *River N*., 2014 WL 7437048 at *3. A court may not use its equitable power to facilitate conduct that implicates the CSA even if that same conduct is lawful under state law. *Fourth Corner*, 861 F.3d at 1055. A federal bankruptcy court may not give a marijuana business the benefit of bankruptcy protections. *Arenas*, 535 B.R. at 847. Plaintiffs attempt to

distinguish the bankruptcy context, which involves a trustee's administration of assets, from this lawsuit. However, the same obstacles a trustee faces in managing marijuana assets the Court has in providing means of redress. It is not just the trustee's obligation to follow federal law but the court's, as well. "In this case, the debtors are unfortunately caught between pursuing a business that the people of Colorado have declared to be legal and beneficial, but which the laws of the United States—laws that every United States Judge swears to uphold—proscribe and subject to criminal sanction." *Id*. at 854.

Lastly, Plaintiffs object to the Court's consideration of an affirmative defense, for which Defendants bear the burden of proof, in reviewing the sufficiency of their pleading. However, the affirmative defense of illegality is relevant to the present Rule 12(b)(6) analysis because its applicability is apparent on the face of the pleadings. *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (permitting dismissal of a claim if "the complaint itself admits all the elements of the affirmative defense"). Even if Plaintiffs subjectively had different intentions or understandings, the TAC makes the nature of the business and the CSA implications clear.

The illegality issue affects Plaintiffs' various theories of relief generally, not just the breach of contract claim. Given the many ways it relates to the analysis, the Court will refer to it as the "illegality defense" for ease of reference. By "illegality defense," the Court means not just the specific affirmative defense that applies in the breach of contract context, but all the ways in which the CSA is implicated and limits Plaintiffs' ability to litigate the lawsuit.

### D.    Limitations on Relief

Even if the CSA does not automatically bar Plaintiffs' ability to sue Defendants, the illegality issue still limits the Court's ability to provide relief. The Court reviewed those restrictions in the prior dismissal ruling, *Sensoria*, 2021 WL 2823080 at *8, and the Court restates them here.

21

First, the injury itself must be cognizable and legitimate. As such, the Court may not vindicate equity in or award profits from a business that grows, processes, and sells marijuana. The claim at issue in *Mann v. Gullickson*, No. 15-cv-03630, 2016 WL 6473215, at *7 (N.D. Cal. Nov. 2, 2016) over the buyer's failure to pay the purchase price of a marijuana business may be analogous to Plaintiffs' equity interest in Clover Top Holdings, Inc. However, *Mann* is distinguishable because (1) there was "no indication in the record [that the business] directly grew or sold marijuana" (*id*. at *1) and (2) there was the possibility that the defendant could pay the purchase price from non-marijuana assets (*id*. at *7).

This leads into the other limit on the Court's ability to provide relief. Relief may not be in a form that endorses violating the CSA. It can neither require an act that would violate the CSA nor award monetary damages paid from a marijuana asset or income stream. To ensure that Defendants could pay compensation from non-marijuana income, Plaintiffs ask the Court to enjoin them to operate the business in a CSA-compliant way. The Court rejected that possibility in the prior dismissal order, *Sensoria*, 2021 WL 2823080 at *10, and the present briefing does not persuade the Court to change its ruling. Plaintiffs do not demonstrate how the legal requirements for the entry of an injunction are satisfied. Moreover, the requested injunction would prevent Defendants from operating a business that presumably is lawful under Colorado law. Even if the Court could use an injunction to sanitize Defendants' assets, Plaintiffs do not explain how it would be achievable in a practical sense. It is unclear how this Court could oversee the operation of a marijuana business to ensure that only CSA-compliant activities are undertaken. That practical difficulty affects not only their request for an injunction but also the request to place the Defendant entities and their assets into a constructive trust. Lastly, Plaintiffs do not explain how a fully CSA-

compliant marijuana operation would generate sufficient income to redress the loss of the enterprise as originally contemplated.

Plaintiffs also ask for discovery to explore whether Defendants could pay compensatory damages from non-marijuana assets. For purposes of this ruling, the Court assumes the potential availability of "fungible" monetary sources from the individual Defendants. The pleadings do not show a likelihood that the Defendant entities have significant income independent of CSA-violative undertakings and assets, and separating out legitimate income from their general revenue creates challenges similar to enjoining CSA-compliant activity.

The same limitations that the Court sketches above, Plaintiffs incorporate into their TAC. They expressly exclude any request for the Court "to compel performance of an illegal contract or compelling a party to violate federal law" or from awarding relief that would violate the CSA "including recovery from assets, holdings, real estate (including retail locations, warehouses, agricultural lands, and individual defendants' property), business activities, property, and other interests independent of illegal activities associated with marijuana." ECF 206 at ¶ 137.

### E.    Rescission

In the TAC's concluding Prayer for Relief, Plaintiffs ask to rescind their purchase of Clover Top Holdings, Inc. shares and for the return of their investment. They seek recission as an alternative to compensatory damages or constructive trust, and as a form of relief otherwise "provided by law or equity." ECF 206 at 87, ¶ 2.

In its prior dismissal ruling, *Sensoria*, 2021 WL 2823080 at *10, the Court raised the potential that recission could be a form of relief that is CSA-complaint and thus would not subject a claim to the illegality bar. Defendants did not argue why the Court could not "as a matter of law return the investment principal to Sensoria (assuming, of course, Sensoria can establish entitlement

to such relief and a permissible payment source)." *Id.* In the absence of legal argument, the Court considered on its own the *In re Malul*, 614 B.R. 699, 711-12 (D. Colo. 2020), *Kush, Inc. v. Van Vranken*, No. 2:20-CV-649 JCM, 2020 WL 8371452, at *5 (D. Nev. June 19, 2020), and *Bart St. III v. ACC Enters., LLC*, No. 17-cv-00083, 2020 WL 1638329, at *9 (D. Nev. Apr. 1, 2020) decisions. Because those cases took differing approaches to the appropriateness of rescission in the CSA context, they offered no clear guidance.

Plaintiffs do not plead rescission as a separate cause of action in the TAC, but in their Response (ECF 221 at 10, 27), they repeat their request for the return of their initial investment" as a form of relief that the Court could award them. Therefore, the Court will consider "rescission" as a form of relief for a violation of claim, *i.e.*, the return of principal, rather than as its own freestanding cause of action.

The parties' dispute over the availability of rescission mirrors their arguments over the affect of the illegality defense, generally. Defendants argue that "Plaintiffs' rescission claim necessarily involves illegal conduct, as their investment would be returned from illegal income streams generated by Defendants' marijuana business." "As a consequence, the balance between illegality and unjust enrichment" does not tip in Plaintiffs' favor. ECF 215 at 7-8.

As the Court noted in its prior ruling, there is the question whether permitting rescission would encourage investment in CSA-violative businesses. On balance, however, the Court finds the matter to weigh in favor of providing rescission. Merely returning the principal money invested a business does not raise the same concerns as awarding profits from its operation. The investor receives no benefit from the marijuana activity. Moreover, by divesting ownership interests and removing the investor from the marijuana business, it furthers the CSA's goals. Of course, the Defendants must refund the principal from money or assets that are independent of their marijuana

operations. Because there is that possibility, especially from the individual Defendants, Plaintiffs'

rescission request does not fail as a matter of law. The actual availability of independent assets or

financial resources will have to be determined at a later litigation stage.

## II.     Plaintiffs' Causes of Action

In the above section, the Court explains the parameters of the illegality defense and how it

limits a federal court's ability to provide redress. With the above limitations in mind, the Court

next considers how they actually affect the various causes of action. Where applicable, the Court

also considers whether Plaintiffs state a plausible claim for relief regardless of any limitations on

the remedy.

### A.     Declaratory, Injunctive, or Other Equitable Relief (First Cause of Action) and Unjust Enrichment/Constructive Trust (Seventeenth Cause of Action)

Plaintiffs' First Cause of Action essentially repeats other theories of wrongdoing expressed

elsewhere in the TAC, and it includes arguments against the applicability of the illegality defense.

To the extent they are redundant, there is no need to discuss those issues separately here. Instead,

the Court limits its consideration of the First Cause of Action to the accounting request. Plaintiffs

ask the Court "to determine how much, if any, money is due to [them] from defendants in excess

of the $700,000.00 [principal they invested in Clover Top Holdings, Inc.] plus interest." ECF 206

at ¶ 154. Previously, after reviewing the substantially same pleading in the SAC, this Court found

that "[a]lthough the CSA generally precludes the Court from awarding any financial benefit from

marijuana, the act of *accounting* for that financial benefit does not directly implicate the CSA in

the same way." *Sensoria*, 2021 WL 2823080 at *9.

Defendants argue that there is no practical need for it. An equitable accounting claim may

be dismissed when the sum at issue (here, the investment principal) already is known and

quantified. *Andrikopoulos v. Broadmoor Mgmt. Co., Inc.*, 670 P.2d 435, 440 (Colo. App. 1983)

(permitting the relief of an accounting when plaintiff is *unable* to determine how much, if any, defendant owes him). What profits Plaintiffs could have earned from their investment in Clover Top Holdings, Inc. (had Defendants operated it lawfully and as promised) is a moot point. This Court cannot award Plaintiffs lost profits from a marijuana business. In light of this new argument and noting Plaintiffs' failure to respond in opposition, the Court dismisses the First Cause of Action.

For their Seventeenth Cause of Action, Plaintiffs bring an unjust enrichment claim against the Defendants (other than Tannenbaum Defendants). Should Plaintiffs prevail on its merits and should that permit the award of their investment principal as damages, then the illegality defense would not impede their ability to assert it. Therefore, the Court does not dismiss it, at least to the extent Plaintiffs bring their unjust enrichment claim directly on their own behalf. Because Clover Top Holdings, Inc. did not invest in itself, the Court does dismiss the derivative version of the claim.

The Court also dismisses the Seventeenth Cause of Action to the extent Plaintiffs ask for Defendants' assets to be placed in a constructive trust. The Defendant entities and their assets are involved in CSA-infringing activities. Just as the federal bankruptcy court declines to put trustees in the position of administering marijuana activities and assets, this Court declines to create a constructive trust here. Nor does the Court see how it would be feasible in practical terms to use the constructive trust to compel Defendants to operate the greater marijuana enterprise in a CSA-compliant manner.

## B.      Breach of Contract (Sixth Cause of Action)

Plaintiffs bring this claim against Clover Top Holdings, Inc. The Court already has questioned what contract Plaintiffs had with Clover Top Holdings, Inc. that Clover Top Holdings,

Inc. actually breached. ECF 199 at 3. As pleaded in the TAC, the breach of contract claim now references Subscription Agreement contractss by which Plaintiffs bought its stock. ECF 206 at ¶ 184. Because Clover Top Holdings, Inc. is in default, this Court does not consider whether Plaintiffs state a plausible claim against it. Nor does the Court consider at this juncture whether the newly added Plaintiffs must formally serve Clover Top Holdings, Inc. to give it notice of *their* breach of contract claims.

Plaintiffs also assert their breach of contract claim against the individual Defendants, Peterson and Kaweske. Because Peterson does not move for dismissal, the Court does not consider whether the claim should be dismissed against him.

However, Kaweske does ask this Court to dismiss this claim as to him. ECF 215 at 18-20. It argues—as this Court already has observed—that he is not party to the Subscription Agreement contracts. As Kaweske points out in his Reply, "Plaintiffs do not dispute [that he] and Plaintiffs never entered into a written contract." ECF 226 at 18. The Court dismisses the *written* contract-based claim that Plaintiffs bring against Kaweske individually.

Plaintiffs include in the Sixth Cause of Action the allegation that Kaweske also breached his oral agreements "that Clover Top [Holdings, Inc.] would engage in the legal cannabis business." ECF 206 at ECF 184. Plaintiffs make no allegation that the business venture ran afoul of Colorado law; to that extent, Kaweske fulfilled his promise. The implication of Plaintiffs' allegation instead is an agreement that Clover Top Holdings, Inc. would abide by the CSA. Restating their theory of fraud, conversion, and breach of fiduciary duty, Plaintiffs further that Kaweske breached an oral agreement "that all cannabis operations in which [he] was or would become involved would be owned by, [be] part of, and fall under the umbrella of the Clover Top business, and that all such profits would inure to the benefits of Plaintiffs as owners." ECF 206 at

27

ECF 184.

The oral contract theory of relief fails, Kaweske argues, for a lack of consideration. To begin with, Plaintiffs allege no direct benefit to Kaweske from the alleged agreement to operate Clover Top Holdings, Inc. lawfully. Plaintiffs' investment in Clover Top Holdings, Inc. benefitted that corporate entity directly, and they do not explain how that benefit may be extended to Kaweske as a corporate officer. Even if there was some mechanism by which Plaintiffs gave consideration to Kaweske, they identify no valid consideration given in return. Generally speaking, a promise to follow the law does not create a contract. *DeJean v. United Airlines, Inc.*, 839 P.2d 1153, 1158 (Colo. 1992). Moreover, Kaweske made the alleged promise to operate the venture legally *before* Plaintiffs bought their Clover Top Holdings, Inc. shares. The Court dismisses the breach of *oral* contract claim against Kaweske individually.

### C.   Breach of the Covenant of Good Faith and Fair Dealing (Seventh Cause of Action)

Although Clover Top Holdings, Inc. already is in default, Plaintiffs add a new claim for relief against it: that it breached the covenant of good faith and fair dealing. The Court does not decide at this juncture whether the newly added Plaintiffs may sue the defaulted entity or whether new claims for relief may be asserted against it without serving it with process. As it did with the Sixth Cause of Action, the Court declines to consider *sua sponte* whether Plaintiffs state a plausible claim against it (or Peterson).

Kaweske asks the Court to dismiss the Seventh Cause of Action to the extent Plaintiffs bring it against him, because they plead no valid underlying contract. "[A] necessary predicate" for this cause of action "is the existence of a contract." *Peace v. Parascript Mgmt., Inc*., 59 F. Supp. 3d 1020, 1029 (D. Colo. 2014). Without a contract, there is no contractual term over which Kaweske could have exercised discretion. *Id.*

**D.**     **Breach of Fiduciary Duty, Corporate Waste, Conversion, Civil Theft, Fraudulent Transfer, and Aiding and Abetting Breach of Fiduciary Duty (Fifth, Tenth, Twelfth, Thirteenth, Fourteenth, and Sixteenth Causes of Action)**

The focus of Plaintiffs' grievance concerns fraud and conversion more than it does a breach of contract. They frame the above theft-based counts in two ways. Primarily, they bring them as derivative claims brought on Clover Top Holdings, Inc.'s behalf against Kaweske and Peterson who managed the entity. In addition to the derivative form, Plaintiffs also bring the Fourteenth and Sixteenth Causes of Action (for fraudulent transfer as well as aiding and abetting breach of fiduciary duty) directly against the Defendants.

Defendants do not argue that Plaintiffs fail to plead the elements that define those respective causes of action. Instead, they seek dismissal on the basis of the illegality defense, and to a large extent, Defendants' argument is persuasive. The primary defect concerns the nature of the injury—damage "to the personal or real property of Clover Top [Holdings, Inc.]"—as Sensoria asserts in the breach of fiduciary duty count. ECF 206 at ¶ 182. As explained above, the Court may not vindicate equity interests in or profits from marijuana, which presumably is the core injury that is subject of these counts. The implication is that the Clover Top Holdings, Inc. business lost its marijuana assets and the ability to profit from them because of the Defendants' acts of mismanagement, fraud, and theft. They are injuries that the illegality defense does not permit this Court to remedy.

However, there is one form of relief that may not implicate the CSA. If by prevailing on their merits, Plaintiffs are able to secure the refund of their investment principal and if the Defendants, presumably the individual Defendants, have assets independent of a marijuana business, then the illegality defense would not be an impediment. This only applies to Plaintiffs'

29

*direct* claims against the *individual* Defendants. As such, the Fourteenth and Sixteenth Causes of Action may remain.

However, Clover Top Holdings, Inc. could not benefit from the rescission option because it paid no money to invest in itself. Therefore, the Court dismisses the derivative claims of the Fifth, Tenth, Twelfth, Thirteenth, Fourteenth, and Sixteenth Causes of Action.

**E.     Fraudulent and Negligent Misrepresentations (Eighth and Ninth Causes of Action)**

With respect to the fraud version of the claim, Plaintiffs and Clover Top Holdings, Inc. say that they "relied on the misrepresentations and nondisclosures of Kaweske and Peterson." ECF 206 at ¶ 197. As for the negligence version, Plaintiffs say that Kaweske and Peterson, along with Clover Top Holdings, Inc., "made misrepresentations of material fact." *Id*. at ¶ 201. For neither do Plaintiffs identify what the false representations were; presumably, they concern statements and promises that the individual Defendants made to solicit their investment in Clover Top Holdings, Inc. The Court does not consider at this time whether Plaintiffs plead the required elements for either theory in a plausible fashion.

Defendants seek both counts' dismissal because of the illegality defense. For the same reasons the Court explains above, the Court grants Defendants' Motions to the extent Plaintiffs brings them derivatively on behalf of Clover Top Holdings, Inc.

However, the Court denies the Motions to the extent Plaintiffs bring the claims against the Kaweske and Peterson directly on the possibility that (1) they offer rescission as a remedy and (2) the individual Defendants have assets independent of CSA-infringing activity with which to pay it. The Court also denies the Motions to the extent Clover Top Holdings, Inc. is named as a Defendant to the Ninth Cause of Action given its default status.

In sum, the Eighth and Ninth Causes of Action remain but narrowed in scope as explained

above.

**F.      Civil Conspiracy (Fifteenth Cause of Action)**

In the prior dismissal ruling, the Court mentioned the elements of a civil conspiracy claim in reference to the Tannenbaum Defendants. *Sensoria*, 2021 WL 2823080 at *14. For purposes of this ruling, the Court does not consider whether Plaintiffs adequately plead the cause of action, but rather, whether the illegality defense poses a legal bar to their ability to proceed with it. Plaintiffs bring this claim derivatively on Clover Top Holdings, Inc.'s behalf. Because the Court finds that the investment principal's reimbursement is the only form of relief that it may award and because Clover Top Holdings, Inc. did not invest in itself, there is no remedy potentially available. Without a means of redress, the claim is dismissed.

**G.      Violations of Federal, Colorado, and Utah Securities Laws (Second, Third, and Fourth Causes of Action)**

Plaintiffs sue Kaweske and Peterson as well as Clover Top Holdings, Inc. for selling shares in violation of securities laws. The underlying violation consists of the use of "a manipulative or deceptive device or contrivance" which led Plaintiffs to believe that enterprise operations would be limited to the legal aspects of the cannabis market. Defendants do not argue that Plaintiffs fail to state a plausible claim for relief under their respective elements. Rather, Defendants argue that the illegality defense renders them defective as a matter of law. In other words, Defendants challenge whether the Court could provide a remedy for the alleged securities law violations.

As a result of the alleged violation of the federal statute, Plaintiffs claim that they "suffered damages . . . in an amount to be determined at trial in excess of $700,000.00 [which is the amount of their invested principal] plus interest." ECF 206 at ¶ 164. Alternatively, they seek the "return of their investments plus interest" as well as "all other legal and equitable relief available to it as a result of these defendants' securities violations." *Id*. at ¶ 165. For the Third and Fourth Causes of

Action under state law, Plaintiffs claim as damages "the consideration paid for their shares in Clover Top [Holdings, Inc.] together with interest [at the statutory rate] from the date of payment, costs, and reasonable attorney fees." *Id*. at ¶¶ 172, 175. In other words, the primary form of relief that Plaintiffs seek is the return of their investment principal. Because the illegality defense does not bar this relief type, Plaintiffs may proceed with their security violation claims. The Court does not dismiss these counts.

## III.   The RICO Claims

A substantial change to the pleading is the expansion of Plaintiffs' RICO claim. The SAC contained one RICO claim which the Court addressed in depth in the prior dismissal ruling. *Sensoria*, 2021 WL 2823080 at *10-12. Sensoria had added the RICO claim to the SAC and premised it on two theories of racketeering activity: (1) Defendants' marijuana activities separate and apart from Clover Top Holdings, Inc. and (2) Defendants' fraudulent inducement of their investment in Clover Top Holdings, Inc. and conversion of the investment entity's assets. The Court dismissed it for Sensoria's failure to plead several elements that define a RICO violation. The Court incorporates by reference that previous statement of governing law.

Plaintiffs now bring three RICO claims. (The Court does not count the fourth RICO claim, brought as the Nineteenth Cause of Action, which Plaintiffs concede should be dismissed. ECF 221 at 40, n.17.) The first RICO count—numbered as the Eighteenth Cause of Action—is brought against Kaweske, Peterson, and Evangelista and is predicated on the act of "growing, selling, and distributing marijuana, and/or the aiding and abetting in furtherance thereof." ECF 206 at ¶ 242. For present purposes, the Court assumes that Clover Top Holdings, Inc.'s operations (whether actual or anticipated) were indeed *lawful*—at least under state law. The racketeering activity subject of the second RICO count—the Twentieth Cause of Action—is Kaweske and Peterson's

theft of the individual Plaintiffs' investment monies. However, it is Sensoria who brings this claim derivatively on Clover Top Holdings, Inc.'s behalf. Sensoria also brings the third RICO count— the Twenty-First Cause of Action—derivatively on Clover Top Holdings, Inc.'s behalf. For it, Sensoria alleges that Kaweske and Evangelista stole Clover Top Holdings, Inc.'s non-monetary assets and property interests.

### A. Cognizable Property Interest

Plaintiffs are limited in the type of injury for which they may use RICO to obtain redress. Not only must they overcome the same type of concerns that the illegality defense raises, but they also must comply with RICO's own restrictive definition of what property damage it covers.

#### 1. CSA Issue

In the previous dismissal ruling, the Court found that Sensoria may not use RICO to vindicate their rights and interests in a marijuana operation. *Sensoria*, 2021 WL 2823080 at *10-11. That defect remains, and common to all three RICO theories is the lack of a cognizable property interest. To the extent Plaintiffs base their RICO claims on property interests that implicate the CSA, they are dismissed.

#### 2. Choses in Action

In order to maintain a civil RICO action for damages, a plaintiff must plead injury "in his business or property." 18 U.S.C. § 1964(c). Federal case law consistently defines the kind of injury that RICO requires as "an actual, concrete monetary loss (i.e., an 'out-of-pocket' loss)." *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 155 F. Supp. 2d 1069, 1090 (S.D. Ind. 2001) (collecting case law). In other words, the injury must be tangible, quantified, realized (that is, actual and not hypothetical), non-speculative, and non-contingent. *Id*. at 1090-96. *See also Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 728-31 (8th Cir. 2004). *Bridgestone/Firestone*

rejected a RICO claim based on the uncertain diminished value or other loss of the tires that plaintiffs had bought. *Bridgestone/Firestone*, 155 F. Supp. 2d at 1091. *Regions Bank* concerned a fraudulent business loan application and a subsequent "scheme of bankruptcy irregularities and corporate shell games" that diminished the value of the loan's collateral. The bank's secondary security interest was an intangible property interest upon which the bank could not base a RICO claim. *Regions Bank*, 387 F.3d at 730.

The TAC adds a new property to their RICO violation theory: their "choses in action." As they explain in their Response (ECF 221 at 38-39), a chose in action is the right to bring an action to recover a debt, money, or thing. In other words, it is the legal right to damage for an injury. As applied here, the choses in action are the non-RICO causes of action that Plaintiffs raise in the TAC. Relying on *Kirk v. Denver Pub. Co*., 818 P.2d 262, 267 (Colo. 1991), Plaintiffs argue that Colorado recognizes as a property interest the legal right to damage for an injury. However, even if a chose in action is a form of property, it is not the kind of tangible and liquidated property interest that RICO is meant to protect. *Rogers v. Baeverstad*, No. 19-CV-327-HAB, 2019 WL 6050400, at *4 (N.D. Ind. Nov. 14, 2019).

Without the required type of injury, Plaintiffs lack standing to assert a RICO claim. *Rogers*, 2019 WL 6050400 at *3.

3. No causal link between Defendants' actions and the impairment of Plaintiffs' choses in action.

Not only must the injury be cognizable, but there must be a causal relationship between it and the RICO violations. *Regions Bank*, 387 F.3d at 728. The injury to a plaintiff's business or property must be "by reason of a violation of section 1962." 18 U.S.C. § 1964(c). There was no direct causal link in *Regions Bank* because the fraud to secure the loan was isolated and distinct from subsequent wrongdoings that made the collateral worthless. *Regions Bank*, 387 F.3d at 729.

Even if RICO protected Plaintiffs' "choses in action," they do not plead a direct link between that property loss and a predicate RICO act by Defendants. Plaintiffs argue that Defendants' operation of the Clover Top Holdings, Inc. enterprise violated the CSA and thereby hinders their present ability to sue the Defendants because that CSA-infringing conduct gives Defendants the benefit of the illegality defense. Defendants did not directly impair the choses in action, *e.g.*, by some action *before* Plaintiffs filed this lawsuit. Instead, the "act" that impaired them was their assertion of the illegality defense. Raising a defense within the scope of a lawsuit is not a predicate RICO act. Moreover, the purpose of the illegality defense is not to protect the Defendants but rather to ensure that this Court provides relief consistent with the law and serves the greater public interest. There is no *causal* relationship for RICO purposes between the CSA-infringing aspects of the Clover Top Holdings, Inc. enterprise and the limitations that the law places on this Court's ability to provide relief.

Plaintiffs' failure to establish the causation element provides grounds to dismiss the Eighteenth Cause of Action.

**B.      PSLRA Bar**

A required predicate to a RICO claim is the occurrence of racketeering activity in violation of 18 U.S.C. § 1962(c). For the predicate act at issue here, Plaintiffs cite 18 U.S.C. § 2314 which criminalizes the interstate transportation of stolen "goods, wares, merchandise, securities, or money." Defendants respond that the RICO statute expressly excludes securities fraud as a covered racketeering act, and thus, Plaintiffs may not sue them under RICO for any wrongdoing concerning securities fraud.

Specifically, the exception that the Private Securities Litigation Reform Act amendment of the RICO statute created is "that no person may rely upon any conduct that would have been

actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c) ("PSLRA bar"). Case law applies the exception broadly. Not only is the act of securities fraud itself barred but so is conduct that would have been actionable as securities fraud and fraud that occurred in connection with the purchase or sale of securities. A plaintiff may not avoid the exemption by artful pleading to recast the predicate acts in a different light. *Bixler v. Foster*, 596 F.3d 751, 759-60 (10th Cir. 2010). "It is enough that the scheme to defraud and the sale of securities coincide." *S.E.C. v. Zandford*, 535 U.S. 813, 822 (2002). Another test to determine applicability is "whether the conduct alleged is of the type generally actionable under the securities laws." *Perkumpulan Investor Crisis Ctr. Dressel v. Wong*, No. C09-1786-JCC, 2014 WL 1047946, at *8 (W.D. Wash. Mar. 14, 2014).

Defendants argue that the grievance underlying the TAC is in substance securities fraud. In their characterization, the solicitation (which began in late 2015), stock purchases (which ran simultaneously with the solicitations through 2016 and into early 2017), and actions contrary to the investment entity's interests (which began around the same time) are one unified fraud scheme. It would be analogous to the situation in *Zanderford* in which each sale of securities by the defendant broker to the investor-victim, while in themselves lawful, were part of the defendant's greater scheme to steal the investor-victim's money. Indeed, such a unified fraud scheme underlies Plaintiffs' separately raised securities law violations.

For purposes of their RICO claims, Plaintiffs differentiate between Defendants' act of (1) inducing them to buy the shares and later (2) converting the investment entity's assets, thereby depriving them of their investment principal, profits from the business had it been managed properly, and assets by which to protect their equity interest. In this way, the subsequent acts of conversion would be distinct from the stock sale, and thus not subject to the PSLRA bar. In support

of their position, they rely on *Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297 (M.D. Fla. 2017). At issue there were two distinct schemes. The first was orchestrated by Mr. Homm who used investor accounts "as vehicles for a massive market manipulation scheme (the 'Penny Stock Scheme')" from September 2004 to September 2007. *Id*. at 1034. In May 2006, after learning that his fraudulent activity would be exposed, Mr. Homm created a complicated money laundering scheme to cover it up and to hide the ill-gotten proceeds. His wife, Ms. Devine, assisted with the money laundering scheme and its many facets. *Id*. at 1304-15. The court found Ms. Devine and her participation in the money laundering scheme to remain within RICO's reach. *Id*. at *1322-23. Although it "certainly related to the Penny Stock Scheme," her actions in furtherance of the money laundering scheme "took place *after* the purchase or sale of securities." *Id*. at *1322 (emphasis in the original). However, it was more than a mere temporal distinction. Ms. Devine did not engage in conduct that would be actionable as fraud in the purchase or sale of securities, but rather it constituted a separate criminal offense (money laundering), which by definition occurs after the money's receipt. *Id*. at *1323.

The TAC portrays a unified fraud scheme. The sequence of events makes it difficult to separate Defendants' alleged actions regarding the sale of Clover Top Holdings, Inc. stock from their alleged actions that harmed the value of the business. That degree of interrelatedness and the PSLRA bar's broad scope warrant applying the bar to Plaintiffs' RICO claims. Because Plaintiffs could—and actually do—allege violations of the securities laws on the same facts, the PSLRA bar prevents them from framing them as RICO violations as well.

Given the PSLRA bar, the Court dismisses the Twentieth and Twenty-First Causes of Action.

### C.     No Continuous Pattern

Plaintiffs' description of a single fraud scheme affects claims' plausibility in another respect: whether the alleged fraudulent acts accomplished a discrete goal (which RICO would not cover) or whether they constitute a pattern of racketeering activity (which RICO does concern). *Erickson v. Farmers Group, Inc*., 151 F. App'x 672 (10th Cir. 2005). To establish the "pattern" element, a plaintiff not only must show multiple predicate acts, "but also that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *Bixler*, 596 F.3d at 761 (internal citation omitted) (emphasis in the original). This element reflects Congress' concern over long-term criminal activity. *Boone v. Carlsbad Bancorporation, Inc*., 972 F.2d 1545, 1556 (10th Cir. 1992).

For present purposes, the Court assumes that Plaintiffs adequately plead a "relationship" between the identified predicate acts, *i.e*., that the acts "have the same or similar purpose, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Boone*, 972 F.2d at 1555. The dispositive question instead is whether Plaintiffs also plead "continuity," the more difficult aspect of the pattern element to establish. *Id*.

Plaintiffs proceed on the "closed-ended" concept of continuity which consists of a closed period of repeated past conduct that extended over a substantial length of time. *Id*. Regarding their Twentieth Cause of Action, Plaintiffs assert "a closed-ended pattern of racketeering activity that consisted of at least fifteen distinct acts over a two-year period." ECF 221 at 43. They identify those fifteen distinct acts by citing ¶¶ 279-304 of the TAC, which are the paragraph numbers for the Twentieth Cause of Action. The scheme subject of this RICO count is defrauding Clover Top

Holdings, Inc.'s investors of their financial investment. In support of their Twenty-First Cause of Action, Plaintiffs allege "a closed-ended pattern of racketeering activity that consisted of at least eleven distinct acts extending over more than a three-year period." *Id*. at 44. This RICO claim concerns defrauding Clover Top Holdings, Inc. of its non-monetary assets and property interests.

The occurrence of multiple predicate acts over a period of several years is needed to plead continuity. *Luttrell v. Brannon*, No. 17-2137-JWL, 2018 WL 3032993, at *5 (D. Kan. June 19, 2018). However, those two factors alone may not be enough. The alleged fraud scheme at issue in *Boone* had both. Nevertheless, it remained a *single* overarching scheme (the transfer of debt) to accomplish a discrete goal (a merger) directed at a finite group of individuals (shareholders) with no potential to extend to other persons or entities. *Boone*, 972 F. 2d at 1556 (dismissing a RICO claim brought by dissenting minority shareholders against various parties involved in a complicated bank merger). In other words, multiple predicate acts over a significant period of time still would not show a pattern of racketeering activity if they constitute a single scheme to accomplish a discrete goal not directed towards others. *Carlson v. Town of Mountain Village, Colo.*, No. 17-cv-02887-PAB-STV, 2019 WL 5819971, at *6 (D. Colo. Nov. 7, 2019). The RICO enterprise at issue in *Luttrell* was in substance a medical malpractice claim that the patient-plaintiff brought against his surgeon, implant device manufacturer, and pain management provider. Continuity of the alleged racketeering activity was found on the basis of multiple predicate acts over the several years of treatment but without consideration of this other aspect of the element. *Luttrell*, 2018 WL 3032993, at *5.

Plaintiffs respond that they do "not allege facts to suggest that this pattern of criminal activity was directed at a single purpose, objective, or goal." ECF 221 at 44. However, they offer no argument beyond that conclusory assertion to support the assertion. Merely dividing the scheme

into subparts does not demonstrate a pattern of racketeering activity if in substance they comprise a completed unified scheme. Similarly, they may not divide a securities fraud scheme into its component parts to avoid application of the PSLRA bar. *Perkumpulan*, 2014 WL 1047946 at *7 (addressing a Ponzi scheme driven by fraudulent investment solicitations and concealment and involving conversion and money laundering to hide the ill-gotten gains). As in *First Capital Asset Mgmt, Inc. v. Satinwood, Inc*., 385 F.3d 159, 180 (2nd Cir. 2004), the substance of wrongdoing that the TAC describes was "inherently terminable." Once Defendants allegedly divested Clover Top Holdings, Inc. of all its assets, "there was nothing left to loot," and the scheme "wound to a close." *Id*. at 181 (dismissing a RICO claim based on defendants' scheme to use a fraudulent bankruptcy to shield them from paying a judgment). Contrary to Plaintiffs' assertion, the TAC indicates a scheme that was not only closed-ended temporally but also in purpose.

One aspect of RICO racketeering activity is the potential targeting of others beyond just the complaining plaintiffs. *Carlson*, 2019 WL 5819971 at *6. In their Response, Plaintiffs express concern that "Defendants currently operate many other businesses and are in the process of securing new investors for those businesses" who, like Plaintiffs earlier, "remain unaware of the current financial distress of Defendants' businesses." ECF 221 at 44. Not only is that assertion conclusory in nature, but it is immaterial to their grievance. Plaintiffs complain about the loss of their investment in Clover Top Holdings, Inc. That entity long since became defunct, and there is no indication that the scheme concerning it will affect any others. Whether Defendants will conduct a similar scheme with respect to a different marijuana business investment opportunity is unrelated to what happened to Plaintiffs.

This Court dismissed the previous RICO claim for the failure to plead the continuity and thus the pattern element. Relying on *Bixler*, 596 F.3d at 761 and *Ginsburg v. ICC Holdings, LLC*,

No. 3:16-CV-2311-D, 2017 WL 5467688, at *22 (N.D. Tex. Nov. 13, 2017), the Court found the alleged acts of wrongdoing to constitute "a single scheme of asset conversion that has been completed" rather than "an ongoing enterprise." *Sensoria*, 2021 WL 2823080 at *11. The TAC also falls short of establishing continuity, and the Court does not find Plaintiffs' reliance on *Luttrell* to compel a different result. The Court dismisses the Twentieth and Twenty-First Causes of Action.

### D.    No Derivative Standing

The Twentieth and Twenty-First Causes of Action suffer from a more fundamental defect. Both are brought only by Sensoria derivatively on behalf of Clover Top Holdings, Inc. However, "corporate shareholders do not have standing to sue under the civil RICO statute for alleged injuries to the corporation." *Bixler*, 596 F.3d at 758. Neither Sensoria specifically nor Plaintiffs together explain in the Response how the derivative action may be maintained. These two causes of action are dismissed.

### E.    No Injunctive Relief

The request for injunctive relief as part of the RICO claims is dismissed. In regards to the preceding SAC, "Sensoria [did] not overcome the Tenth Circuit's 'considerable doubt [whether] equitable relief is available to private RICO litigants under any circumstances." *Sensoria*, 2021 WL 2823080 at *11 (citing *Switzer v. Coan*, 261 F.3d 985, 992, n.14 (10th Cir. 2001)). Plaintiffs fail to address this matter again in the present round of briefing.

### F.    Summation

The grievance that underlies the TAC is the loss of the investment in Clover Top Holdings, Inc. Plaintiffs express that grievance through different theories of wrongdoing. However, they do not show how it translates into a RICO violation under its very specific definition. Plaintiffs' RICO theory suffers from several different flaws that altogether warrant dismissal. This concerns not

41

only the Eighteenth, Twentieth, and Twenty-First Causes of Action for the failure to state a plausible claim and standing, but also the Nineteenth Cause of Action for which Plaintiffs concede dismissal.

## IV.    Leave to Amend

Dismissal of a case is a harsh remedy, and as a general rule, a litigant should have the opportunity to amend the complaint and cure pleading defects. Fed. R. Civ. P. 15(a)(2). However, this was the fourth attempt to present their claims for relief. Despite the benefit of prior successive rulings and amendments, fundamental pleading defects and legal bars to relief remain. The Court forewarned Plaintiffs that the TAC would be their last opportunity to plead their case. This dismissal ruling is with prejudice and without leave to file a fourth amended complaint. Plaintiffs shall proceed forward on those claims that remain or have been narrowed by this ruling.

## CONCLUSION

Plaintiffs describe themselves as victims of fraud, theft, and mismanagement of their Clover Top Holdings, Inc. investment, and it expresses that grievance through several different causes of action. However, because the investment implicates the CSA, the Court's ability to provide redress is limited. In addition, there are claims for which dismissal is warranted for the failure to plead them in a plausible fashion irrespective of the illegality defense.

Accordingly, for the above reasons, the Kaweske Defendants' Motion to Dismiss [filed September 17, 2021; ECF 215] and the Evangelista Defendants' Motion to Dismiss [filed September 17, 2021; ECF 216] are **granted in part and denied in part** as follows:

The Court dismisses the following claims: the First, Fifth, Sixth, Seventh, Tenth, Twelfth, Thirteenth, and Fifteenth Causes of Action.

The Second, Third, Fourth, Eighth, Ninth, Fourteenth, Sixteenth, and Seventeenth Causes

of Action are permitted only to the extent Plaintiffs may assert them directly (and not derivatively on Clover Top Holdings, Inc.'s behalf), and the remedy, should they prevail, is limited to the investment principal's return paid from non-marijuana assets.

All RICO claims—the Eighteenth, Nineteenth, Twentieth, and Twenty-First Causes of Action—are dismissed.

The above dismissals do not concern claims that are brought against defaulted Defendants or against Peterson who has not moved for dismissal. To this extent, the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Twelfth, Thirteenth, Fourteenth, Fifteenth, Seventeenth, Eighteenth, and Twentieth Causes of Action remain.

Not subject of this ruling is the Eleventh Cause of Action brought against the Tannenbaum Defendants.

SO ORDERED.

Dated at Denver, Colorado, this 24th day of January, 2022.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge